# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No.:** 1:11-cv-01110-RBJ-KMT

SHIRE LLC,                                       )
SUPERNUS PHARMACEUTICALS, INC.,                  )
SHIRE DEVELOPMENT INC.,                          )
SHIRE INTERNATIONAL LICENSING                    )
B.V.,                                            )
AMY F.T. ARNSTEN, PH.D.,                         )
PASKO RAKIC, M.D., and                           )
ROBERT D. HUNT, M.D.,                            )
                                                 )
                    Plaintiffs,                  )
                                                 )
          v.                                     )
                                                 )
SANDOZ INC.,                                     )
                                                 )
                    Defendant.                   )

## PLAINTIFFS' OPENING BRIEF ON CLAIM CONSTRUCTION

# TABLE OF CONTENTS

I.    Introduction .................................................................................................. 1

    A.   The '290 Patent ........................................................................................ 1

    B.   The '599 and '794 Patents ....................................................................... 3

II.   Nature and Stage of the Proceedings ........................................................... 11

III.  Statement of Facts ....................................................................................... 12

IV.   Argument ..................................................................................................... 13

    A.   General Claim Construction Principles ................................................... 13

    B.   The Court Should Adopt Plaintiffs' Proposed  Constructions for
        the Disputed Terms of the '290 Patent .................................................... 16

        1.   The Court Should Adopt Plaintiffs' Proposed Construction
            for the Disputed Term "without inducing excessive
            sedation" .................................................................................... 16

        2.   The Court Should Adopt Plaintiffs' Proposed Construction
            for the Disputed Term "readministering the dose at an
            interval required to obtain a desired level and duration of
            behavioral inhibition" ................................................................. 19

        3.   The Court Should Adopt Plaintiffs' Proposed Construction
            for the Disputed Term "inhibiting a disinhibitory behavior" ... 21

        4.   The Court Should Adopt Plaintiffs' Proposed Construction
            for the Disputed Term "a behavior inhibiting dose of
            guanfacine" ................................................................................ 23

        5.   The Court Should Adopt Plaintiffs' Proposed Construction
            for the Disputed Term "treating a behavioral disinhibition" .... 23

    C.   The Court Should Adopt Plaintiffs' Proposed Constructions for the
        Disputed Terms of the '599 and '794 Patents ......................................... 24

        1.   The Court Should Adopt Plaintiffs' Proposed Construction
            for the Disputed Term "pH dependent agent that increases
            the rate of release of said at least one pharmaceutically
            active agent from the tablet at a pH in excess of 5.5" ............... 24

2.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "polymer that swells at a pH in excess of 5.5"................................................................................31

3.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5" ...................................................................32

4.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "agent that maintains an acidic microenvironment in the composition".......................................34

5.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "reducing the likelihood of side effects associated with the administration of guanfacine" .......................36

6.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "pharmaceutically active agent that is pH dependent" .................................................................39

7.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Terms Relating to "about percentage weights".................................................................................40

V.   Conclusion.................................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003) ........................................................................15

*Arlington Indus. v. Bridgeport Fittings, Inc.*,
   632 F.3d 1246 (Fed. Cir. 2011) ....................................................................14, 15

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*,
   334 F.3d 1294 (Fed. Cir. 2003) ........................................................................15

*i4i Ltd. Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ..........................................................................14

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ........................................................................13

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999) ..........................................................................13

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ..........................................................................15

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ......................................................................13, 14

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009) ........................................................................14

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................................13, 14

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................13

## Statutes

21 U.S.C. § 355(j)(2)(A)(vii)(IV) .........................................................................11

## I.    Introduction

Plaintiffs Shire LLC, Supernus Pharmaceuticals, Inc., Shire Development Inc., Shire

International Licensing B.V., Amy F.T. Arnsten, Ph.D., Pasko Rakic, M.D., and Robert D. Hunt,

M.D. (collectively "Plaintiffs") submit this brief on claim construction for U.S. Patent Nos.

5,854,290 (the "'290 patent"); 6,287,599 (the "'599 patent"); and 6,811,794 (the "'794 patent").

### A.    The '290 Patent

The '290 patent is generally directed to methods of using guanfacine to treat disorders

that have the prominent symptoms of behavioral disinhibition, such as attention deficit

hyperactivity disorder, without inducing excessive sedation.[1]  Independent claims 1 and 7 and

dependent claims 2 and 8, reproduced below, recite the disputed claim terms of the '290 patent.[2]

> 1.   A method of **treating a behavioral disinhibition** in a
> primate **without inducing excessive sedation**, comprising
> administering to the primate **a behavior inhibiting dose of
> guanfacine**, wherein the dose ranges between 0.01 mg/kg of body
> weight and 0.86 mg/kg of body weight.
>
> 2.   The method of claim 1, comprising the additional step of
> **readministering the dose at an interval required to obtain a
> desired level and duration of behavioral inhibition**.
>
> *      *      *
>
> 7.   A method of **inhibiting a disinhibitory behavior** in a
> primate **without inducing excessive sedation**, comprising:
> administering to the primate **a behavior inhibiting dose of
> guanfacine**, wherein the dose ranges between 0.01 mg/kg of body
> weight and 0.86 mg/kg of body weight.
>
> 8.   The method of claim 7, comprising the additional step of
> **readministering the dose at an interval required to obtain a
> desired level and duration of behavioral inhibition**.

---

[1] *See* Braunel Decl. Ex. 1, '290 patent *passim.*
[2] Braunel Decl. Ex. 1, '290 patent, col. 12, ll. 29-36, ll. 39-42, ll. 48-54 (emphasis added; disputed terms shown in
bold).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiffs and Sandoz have narrowed the number of claim terms in dispute through two successful meet-and-confers and subsequent communications.  Nonetheless, Plaintiffs and Sandoz dispute the meaning of the following claim terms or parts thereof -- with the underlining in the chart below intended to indicate particular language that remains in dispute.

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|---|---|---|---|
| without inducing excessive sedation | without inducing sedation to an extent that impairs functioning | without inducing as much sedation as clonidine | |
| readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition | administering an amount of guanfacine multiple times within a single day or on multiple days to obtain a desired degree and length of time of improvement of self-control of behavior | administering an amount of guanfacine multiple times to obtain improvement of behavioral disinhibition over a longer period of time than would be achieved with a single administration | Sandoz agrees to add "within a single day or on multiple days" to its construction |
| inhibiting a disinhibitory behavior | improving any symptom associated with lack of self-control of behavior, such symptoms including but not limited to agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, and uncontrolled movements | retarding, arresting or restraining a behavioral disinhibition symptom, such symptom including but not limited to agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, or uncontrolled movements | Sandoz agrees to change "retarding, arresting or restraining" to "improving" |

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|---|---|---|---|
| a behavior inhibiting dose of guanfacine | an amount of guanfacine that improves <u>self-control of behavior</u> | plain meaning, i.e., an amount of guanfacine that improves <u>behavioral disinhibition</u> | |
| treating a behavioral disinhibition | treating a disorder having prominent symptoms of <u>lack of self-control of behavior</u> including but not limited to Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, or the lack of self-control of behavior accompanying Post-Traumatic Stress Disorder or Dementia | combating or curing a disorder having prominent symptoms of <u>behavior disinhibition</u>, such disorders including but not limited to Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, Post-Traumatic Stress Disorder or dementia | Sandoz agrees to change "combating or curing" in its construction to "treating" |

**B.     The '599 and '794 Patents**

The '599 patent is generally directed to pharmaceutical compositions containing active agents such as guanfacine hydrochloride or anagrelide hydrochloride, a non-pH dependent sustained-release agent, and a pH-dependent agent that increases the release rate of the pharmaceutically active agent from the pharmaceutical composition at a pH in excess of 5.5.[3] Independent claim 1 and dependent claims 2, 4, 13, and 18-23, reproduced below, recite the disputed claim terms of the '599 patent.[4]

---

[3] Braunel Decl. Ex. 2, '599 patent.
[4] Braunel Decl. Ex. 2, '599 patent, col. 7, ll. 33-44, 47-50, 62-67, col. 8, ll. 27-31, 50-54, 63-67, col. 9, ll. 1-17 (emphasis added; disputed terms shown in bold).

1.   A pharmaceutical composition, comprising:

    (a)    at least one **pharmaceutically active agent that is pH dependent**:

    (b)    at least one **non-pH dependent sustained release agent**; and

    (c)    at least one **pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5**.

\*     \*     \*

2.   The composition of claim 1 wherein said at least one pH dependent agent is at least one **polymer that swells at a pH in excess of 5.5**.

\*     \*     \*

4.   The composition of claim 1 wherein said at least one pH dependent agent is at least one **agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5**.

\*     \*     \*

13. The composition of claim wherein said pH-dependent agent that increase the rate of release of the at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5 is an **agent that maintains an acidic microenvironment in the composition**.

\*     \*     \*

18. The composition of claim 1 wherein **said pharmaceutically active agent is present in the composition in an amount of from about 0.1 wt. % to about 70 wt. %**.

\*     \*     \*

19. The composition of claim 18 wherein **said pharmaceutically active agent is present in the composition in an amount of from about 1 wt. % to about 40 wt. %**.

*     *     *

20. The composition of claim 1 wherein **said non-pH-dependent sustained release agent is present in the composition in an amount of from about 5 wt. % to about 50 wt. %.**

*     *     *

21. The composition of claim 20 wherein **said non-pH-dependent sustained release agent is present in the composition in an amount of from about 10 wt. % to about 30 wt. %.**

*     *     *

22. The composition of claim 1 wherein **said at least one pH-dependent agent is present in the composition in an amount of from about 0.5 wt. % to about 40 wt. %.**

*     *     *

23. The composition of claim 22 wherein **said at least one pH-dependent agent is present in the composition in an amount of from about 1 wt. % to about 20 wt. %.**

The '794 patent is generally directed to guanfacine compositions containing a non-pH dependent sustained release agent and a pH-dependent agent that increases the release rate of the pharmaceutically active agent from a composition at a pH in excess of 5.5, as well as methods of treating attention deficit hyperactivity disorder by administering such compositions and reducing the likelihood of side effects associated with guanfacine administration.[5]

Independent claims 3 and 8 and dependent claims 4, 5, 9, and 10, reproduced below, recite the disputed claim terms of the '794 patent.[6]

---

[5] *See* Braunel Decl. Ex. 3, '794 patent *passim*.

[6] Braunel Decl. Ex. 3, '794 patent, col. 15, ll. 6-37, 40-41, col. 16, ll. 4-31 (emphasis added; disputed terms shown in bold). The issued claims contain typographical errors because the issued claims did not incorporate the changes made in applicants' April 24, 2004 amendment. *See* Ex. 4, February 12, 2004 Office Action and April 21, 2004 Response to February 10, 2004 Office Action. The claims quoted here reflect the corrections in the April 24, 2004 amendment.

3.   A method for treating an attention deficit disorder or attention deficit with hyperactivity disorder in a patient, comprising administering to said patient a composition comprising

(a)   at least one **pharmaceutically active agent that is pH dependent**, said pharmaceutically active agent being guanfacine or guanfacine hydrochloride;

(b)   at least one **non-pH dependent sustained release agent** selected from the group consisting of ethylcellulose, cellulose acetate, vinyl acetate/vinyl chloride copolymers, acrylate/methacrylate copolymers, polyethylene oxide, hydroxypropyl methylcellulose, carageenan, alginic acid and salts thereof, hydroxyethyl cellulose, hydroxypropyl cellulose, karaya gum, acacia gum, tragacanth gum, locust bean gum, guar gum, sodium carboxymethyl cellulose, methyl cellulose, beeswax, carnauba wax. cetyl alcohol, hydrogenated vegetable oils, and stearyl alcohol; and

(c)   at least one **pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from a tablet dosage form at a pH in excess of 5.5**; which is given in an amount effective to treat said attention deficit disorder or attention deficit with hyperactivity disorder in said patient.

*        *        *

4.   The method of claim 3, wherein said at least pH-dependent agent is at least one **polymer that swells at a pH in excess of 5.5**.

*        *        *

5.   The method of claim 4, wherein said at least one **polymer that swells at a pH in excess of 5.5** is selected from acrylic acid polymers, sodium alginate, carrageenan, alginic acid, pectin, or sodium carboxymethylcellulose.

*        *        *

8.   A method of **reducing the likelihood of side effects associated with the administration of guanfacine**, comprising administering to a patient a therapeutically effective amount of a composition comprising

(a)      at least one **pharmaceutically active agent that is pH dependent**, said pharmaceutically active agent being guanfacine or guanfacine hydrochloride;

(b)      at least one **non-pH dependent sustained release agent** selected from the group consisting of ethylcellulose, cellulose acetate, vinyl acetate/vinyl chloride copolymers, acrylate/methacrylate copolymers, polyethylene oxide, hydroxypropyl methylcellulose, carageenan, alginic acid and salts thereof, hydroxyethyl cellulose, hydroxypropyl cellulose, karaya gum, acacia gum, tragacanth gum, locust bean gum, guar gum, sodium carboxymethyl cellulose, methyl cellulose, beeswax, carnauba wax, cetyl alcohol, hydrogenated vegetable oils, and stearyl alcohol; and

(c)      at least one **pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from a tablet dosage form at a pH in excess of 5.5**.

\*      \*      \*

9.  The method of claim 8, wherein said at least one pH-dependent agent is at least one **polymer that swells at a pH In excess of 5.5**.

\*      \*      \*

10. The method of claim 9, wherein said at least one **polymer at swells at a pH in excess of 5.5** is selected from acrylic acid polymers, sodium alginate, carrageenan, alginic acid, pectin, or sodium carboxymethylcellulose.

Again, through repeated consultation, the parties have narrowed the disputed claim terms

for the '599 and '794 patents:[7]

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|------|-----------------------------------|--------------------------------|-------------------|
|      |                                   |                                |                   |

---

[7] The '599 and '794 patents are not members of the same patent family.

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|------|-----------------------------------|--------------------------------|-------------------|
| non-pH dependent sustained release agent | agent that slows release of the pharmaceutically active agent over an extended period of time regardless of gastrointestinal pH | a substance that slows the rate of release of a pharmaceutically active agent from a composition regardless of the pH of the surrounding media | Sandoz agrees to limit its construction to a physiologically appropriate pH range (i.e., gastrointestinal pH range) |
| pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at pH in excess of 5.5[8] | agent that increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 relative to an environment that has a pH of 5.5 or below | a substance that increases the rate of release of a pharmaceutically active agent from a composition in surrounding media having a pH above 5.5 | |
| agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5 | agent that increases the amount of the pharmaceutically active agent that will dissolve in a given amount of another substance in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below | a substance that increases the amount of a pharmaceutically active agent that will dissolve when the surrounding media has a pH above 5.5 | |

---

[8] Independent claims 3 and 8 of the '794 patent recite "a tablet dosage form" instead of "a tablet."

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|------|-----------------------------------|--------------------------------|-------------------|
| agent that maintains an acidic microenvironment in the composition | agent that imparts an acidic character to the regions immediately around or in close proximity to the pharmaceutically active agent in the composition | a substance that imparts a greater acidic character in the regions immediately around or in close proximity to a pharmaceutically active substance than that of the surrounding media | |
| polymer that swells at a pH in excess of 5.5 | molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below | plain meaning, i.e., a molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in surrounding media having a pH above 5.5 | |
| reducing the likelihood of side effects associated with the administration of guanfacine | reducing the probability of side effects resulting from guanfacine administration | decreasing the incidence or severity of side effects compared to administering the same amount of guanfacine as an immediate-release composition | |
| pharmaceutically active agent that is pH dependent | no construction needed—plain and ordinary meaning | a molecule that provides activity in the body and that has pH-dependent aqueous solubility | |

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|---|---|---|---|
| hydroxypropyl methylcellulose | no construction needed—plain and ordinary meaning | plain meaning, i.e., the compound cellulose 2-hydroxypropyl methyl ether, (CAS Registry No. 9004-65-3) | |
| said pharmaceutically active agent is present in the composition in an amount of from about 0.1 wt. % to about 70 wt. % | the pharmaceutically active agent is present from approximately 0.1% by weight to approximately 70% by weight | plain meaning, the pharmaceutically active agent is present in the composition in an amount of from 0.05 wt. % to 75 wt. % | |
| said pharmaceutically active agent is present in the composition in an amount of from about 1 wt. % to about 40 wt. % | the pharmaceutically active agent is present from approximately 1% by weight to approximately 40% by weight | plain meaning, the pharmaceutically active agent is present in the composition in an amount of from 0.5 wt. % to 45 wt. % | |
| said non-pH-dependent sustained release agent is present in the composition in an amount of from about 5 wt. % to about 50 wt. % | the non-pH dependent sustained release agent is present from approximately 5% by weight to approximately 50% by weight | plain meaning, the non-pH dependent sustained release agent is present in the composition in an amount of from 4.5 wt. % to 55 wt. % | |

– 10 –

| Term | Plaintiffs' Proposed Construction | Sandoz's Proposed Construction | Partial Agreement |
|---|---|---|---|
| said non-pH-dependent sustained release agent is present in the composition in an amount of from about 10 wt. % to about 30 wt. % | the non-pH dependent sustained release agent is present from approximately 10% by weight to approximately 30% by weight | plain meaning, the non-pH dependent sustained release agent is present in the composition in an amount of from 5 wt. % to 35 wt. % | |
| said at least one pH-dependent agent is present in the composition in an amount of from about 0.5 wt. % to about 40 wt % | the pH dependent agent is present from approximately 0.5% by weight to approximately 40% by weight | plain meaning, at least one pH-dependent agent is present in the composition in an amount of from 0.45 wt. % to 45 wt. % | |
| said at least one pH-dependent agent is present in the composition in an amount of from about 1 wt. % to about 20 wt. % | the pH dependent agent is present from approximately 1% by weight to approximately 20% by weight | plain meaning, at least one pH-dependent agent is present in the composition in an amount of from 0.5 wt. % to 25 wt. % | |

## II.    Nature and Stage of the Proceedings

This is an action for patent infringement arising out of the patent laws of the United States, Title 35, United States Code, and the Hatch-Waxman Act.[9]  Sandoz, Inc. ("Sandoz") has filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA") seeking approval for a generic version of Intuniv®, a drug product containing

---

[9] (D.I. 1); *see* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

guanfacine hydrochloride approved for the treatment of Attention-Deficit Hyperactivity Disorder ("ADHD").[10]

Plaintiffs filed a complaint for patent infringement, alleging that Sandoz's proposed ANDA product infringes the '290, '599, and '794 patents.[11]  Pursuant to this Court's order, the parties exchanged initial claim constructions on January 6, 2012, and engaged in subsequent meet-and-confers to narrow the issues, pursuant to the Court's scheduling Order..[12]   The Court set the filing of opening claim construction briefs for February 3, 2012, the filing of rebuttal claim construction briefs for March 16, 2012, and the deadline for the parties to propose a *Markman* hearing date to the Court for March 23, 2012.[13]  The parties are currently engaged in fact discovery.

## III.   Statement of Facts

U.S. Patent Application Serial No. 08/531,643, which issued as the '290 patent on December 29, 1998, was filed on September 21, 1995.[14]  U.S. Patent Application Serial No. 09/741,548, which issued as the '599 patent on September 11, 2001, was filed on December 20, 2000.[15]  U.S. Patent Application Serial No. 10/027,349, which issued as the '794 patent on November 2, 2004, was filed on December 20, 2001.[16]

---

[10] (D.I. 1).

[11] (*Id.*).

[12] (D.I. 48; D.I. 84).

[13] (D.I. 85; D.I. 84 at 9).

[14] Braunel Decl. Ex. 1, '290 patent, cover page.

[15] Braunel Decl. Ex. 2, '599 patent, cover page.

[16] Braunel Decl. Ex. 3, '794 patent, cover page.

## IV.   Argument

### A.   General Claim Construction Principles

Claim construction begins with the language of the claims themselves. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004))).   Construing a patent's claims is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 388-90 (1996).

The words of a claim "are generally given their ordinary and customary meaning according to a person of ordinary skill in the art . . . at the time of the invention." *Phillips*, 415 F.3d at 1312-13.   When interpreting the words of the claim, "a court must presume that the terms in the claim mean what they say." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (affirming district court because the ordinary and accustomed meaning of the claim terms was used).   Consequently, where the ordinary meaning of claim language "involves little more than the application of the widely accepted meaning of commonly understood words," general purpose dictionaries may be helpful. *Phillips*, 415 F.3d at 1314.

If a claim term is disputed, courts look primarily to the *intrinsic* evidence in the record, i.e., the patent itself, including its claims, the specification, and the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (reversing district court for relying on extrinsic evidence where the specification of the patent was clear and unambiguous as to the meaning of a disputed claim term).   When helpful to the court, technical dictionaries and treatises can also assist the court in determining the particular terminology of

those of skill in the art in various fields of science and technology.  *Phillips*, 415 F.3d at 1317-18.

While the specification "is the single best guide to the meaning of a disputed term," disclosures in the specification should not be read into the claims.  *Id.* at 1315, 1323.  "The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims."  *See Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1256 (Fed. Cir. 2011) (quoting *Markman*, 52 F.3d at 980) (vacating grant of summary judgment because a limitation from the specification was erroneously read into a claim).

The Federal Circuit's prohibition on reading a limitation from the specification into the claims is strong; "[g]enerally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a 'clear intention' to limit the claim's scope with 'words or expressions of manifest exclusion or restriction.'"  *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) (refusing to limit the term "distinct" without a clear articulation in the patent specification to limit the claim scope), *cert. granted* (on other grounds).  "'[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words o[r] expressions of manifest exclusion or restriction.'"  *Arlington Indus.*, 632 F.3d at 1254 (quoting *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009)).

For example, in *Arlington Industries* the district court construed "spring metal adaptor" to mean a "split spring metal adaptor."  632 F.3d at 1252.  In one embodiment disclosed in the specification, the adaptor was depicted as an incomplete metal circle or a ring with a split in the metal.  *Id.* at 1254.  The district court reasoned that the split was necessary for the adaptor to operate as a "spring."  *Id.* at 1252.

The Federal Circuit stated that the district court erred in its claim construction, ruling instead that the claim term "spring metal adaptor" meant "an adaptor made of spring metal." *Id.* at 1256. The Federal Circuit began with the plain language of the claims, reasoning that "[c]onsistent with the ordinary and customary meaning of ["spring metal adaptor"], this term imposes the limitation that the adaptor must be made of spring metal." *Id.* at 1253. The Federal Circuit observed that the district court had improperly read a limitation from a preferred embodiment into the claims, reasoning that "the intrinsic evidence reveal[ed] no intent to limit the term 'spring metal adaptor' by using it in a manner that excludes unsplit adaptors." *Id.* at 1253, 1255.

The difference between reading the claim in light of the specification and importing a limitation turns on whether the patent specification expresses the clear intent to limit the claim. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 908-09 (Fed. Cir. 2004) (finding the district court improperly construed the claims when the proper construction of the claims was clear). In cases where the Federal Circuit has interpreted claim language narrowly, it has done so "not merely because the specification did not describe a broader embodiment, but because the specification, claim, or prosecution made clear that the invention was limited to a particular structure." *Id.* at 907-08.

The Federal Circuit has repeatedly refused to limit a claim unless the patent (or prosecution history) makes an affirmative statement limiting the invention. *See, e.g., Liebel-Flarsheim*, 358 F.3 at 903 (refusing to limit the claims to require a pressure jacket); *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) (refusing to limit the term "remote" without a limiting statement in the specification); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371 (Fed. Cir. 2003) (refusing to limit the claims because there was no

affirmative disclaimer of the plain meaning of claim language, even though the specification consistently disclosed a particular limitation).

**B.    The Court Should Adopt Plaintiffs' Proposed Constructions for the Disputed Terms of the '290 Patent**

Plaintiffs construe the disputed terms of the '290 patent according to their plain and ordinary meaning in light of the disclosures in the specification. As such, the Court should adopt Plaintiffs' proposed definitions, which are in accord with the legal principles governing claim construction.

**1.    The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "without inducing excessive sedation"**

Independent claims 1 and 7 of the '290 patent recite the disputed claim term administering guanfacine "without inducing excessive sedation."[17]

**a.    The Parties' Proposed Constructions**

| "without inducing excessive sedation" | |
| --- | --- |
| **Plaintiffs** | **Sandoz** |
| without inducing sedation to an extent that impairs functioning | without inducing as much sedation as clonidine |

**b.    The Plain Meaning of the Claim Term Supports Plaintiffs' Proposed Construction**

Plaintiffs construe "without inducing excessive sedation" to mean "without inducing sedation to an extent that impairs functioning." Such construction is consistent with the plain meaning of the term and is supported by the '290 patent specification. At the core of the parties' dispute is the meaning of "excessive" as it modifies "sedation" in the context of the '290 patent. The plain meaning of excessive is "too much or too great" or "more than what is normal or

---

[17] Braunel Decl. Ex. 1, '290 patent, col. 12, ll. 30, 48.

necessary."[18]  As discussed below, in the context of the '290 patent, too much sedation or more

than normal sedation would be sedation "to an extent that impairs functioning."

> ### c.  The Specification Supports Plaintiffs' Proposed Construction of "without inducing excessive sedation"

Prior to the innovations of the '290 patent, the treatment of behavioral disinhibition

(disorders involving lack of self control of behavior and/or significant hyperactivity) were

believed to require some level of sedation.  (Braunel decl. Ex. 1, '290 patent, Col. 2, lines 24-

28).  The problem with medicines that cause sedation, however, is that they can be impairing.

Although passing out or other extreme levels of sedation may quite literally "stop" hyperactive

behavior, such outcomes also prevent normal functioning.  In the context of treating ADHD,

guanfacine was found to provide effective treatment "without inducing excessive sedation".

That phrase distinguishes normal or mild sedation from excessive sedation – sedation that is

impairing.  As the specification states:

> "patients [on guanfacine] were neither sedated **nor impaired in functioning**."

Braunel Decl. Exh. 1, '290 Patent, Col. 8, lines 45-46 (emphasis added).  The quote makes the

clear distinction between mere sedation and something in excess of that -- impairment of

function.

Defendant's construction requires a comparison to the effects of clonidine -- a related but

different drug -- to interpret the claim and the meaning of "excessive sedation".  The plain words

of the claim do not express or require any comparison with clonidine.

Clonidine is an alpha-2 adrenergic agonist[19] that was considered as a treatment for

behavioral disorders.[20]  The drawback to clonidine treatment is that it has significant adverse side

---

[18] Braunel Decl. Ex. 5, p. 488.

effects, including "excessive sedation."[21]  Thus, clonidine's clinical effects can provide a

particular example -- although not the only example -- of "excessive sedation".   Importantly,

nowhere in the patent is it stated that clonidine is the only drug against which guanfacine's

clinical effects are to be judged.

In describing clonidine's excessive sedation, the '290 patent states that such sedation

"itself often interfered with academic performance and other activities."[22]  Thus in the words of

the patent the effects of clonidine are judged in relation to whether the drug interferes with

"academic performance and other activities," and not against the effects of some other drug.

The monkey studies cited in the patent employed two ratings scales: one to assess sedation (i.e.,

side effects) and the other to assess aggression/docility (i.e., beneficial drug effects).[23]  The use

of these scales makes it clear that clonidine and guanfacine were not assessed against one

another – they were assessed against a relative scale of function.   In these studies, either young

or aged monkeys were administered guanfacine.   In the study involving young monkeys,

guanfacine was found to reduce/decrease agitation ratings without inducing sedation[24] and

significantly calm behavior without inducing sedation.[25]  Similarly, in the aged monkeys

"beneficial effects were observed without inducing sedation."[26]

The sedative effects of guanfacine were also evaluated in children and adolescents.

Following administration of guanfacine these patients were described as "neither sedated nor

---

[19] Braunel Decl. Ex. 1, '290 patent, col. 2, l. 6.
[20] Braunel Decl. Ex. 1, '290 patent, col. 2, l. 5.
[21] Braunel Decl. Ex. 1, '290 patent, col. 2, ll. 14-17.
[22] Braunel Decl. Ex. 1, '290 patent, col. 2, ll. 25-27.
[23] *See* Braunel Decl. Ex. 1, '290 patent, col. 5, ll. 13-15.
[27] Braunel Decl. Ex. 1, '290 patent, col. 8, ll. 45-46.
[27] Braunel Decl. Ex. 1, '290 patent, col. 8, ll. 45-46.
[27] Braunel Decl. Ex. 1, '290 patent, col. 8, ll. 45-46.

impaired in functioning,"[27] demonstrating that guanfacine did not produce either sedation or excessive sedation (i.e., impaired functioning).  An overall description by the parents of the children who were administered guanfacine was one of "significant improvement in their children's behavior and functioning."[28]

In sum, the '290 patent analyzes sedation as it relates to treatment with guanfacine, describing excessive sedation as being impaired in functioning.  Accordingly, the person of ordinary skill in the art would understand the term "without inducing excessive sedation" in the context of the '290 patent to mean "without inducing sedation to an extent that impairs functioning."

Moreover, the claims of the '290 patent  do not make mention of clonidine at all.  They do not require a comparison with the effects of clonidine.  Nor does the specification indicate anywhere that "excessive sedation" is only defined by that level of sedation produced by clonidine.  Clonidine provides merely one example of what "excessive sedation" can look like. It is not the exclusive definition.  For that reason, Defendant's definition is unnecessary and reads limitations into the claim that do not exist.  Impairment of functioning is the proper construction of excessive sedation.

> **2.   The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition"**

Dependent claims 2 and 8 of the '290 patent recite "readministering the dose [of guanfacine] at an interval required to obtain a desired level and duration of behavioral inhibition."[29]

---

[27] Braunel Decl. Ex. 1, '290 patent, col. 8, ll. 45-46.
[28] Braunel Decl. Ex. 1, '290 patent, col. 8, ll. 16-19.
[29] Braunel Decl. Ex. 1, '290 patent, col. 12, ll. 35-36, ll. 53-54.

a.     **The Parties' Proposed Constructions**

| "readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition" | |
| --- | --- |
| **Plaintiffs** | **Sandoz** |
| administering an amount of guanfacine multiple times within a single day or on multiple days to obtain a desired degree and length of time of **improvement of self-control of behavior** | administering an amount of guanfacine multiple times within a single day or on multiple days to obtain a desired degree and length of time of improvement of **behavioral disinhibition** |

b.     **The Plain Language of the Claim
Supports Plaintiffs' Proposed Construction**

Plaintiffs construe "readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition" to mean "administering an amount of guanfacine multiple times within a single day or on multiple days to obtain a desired degree and length of time of improvement of self-control of behavior." The plain language of the term incorporates: (1) multiple guanfacine administrations, (2) a level of behavioral inhibition, and (3) a duration of behavioral inhibition. Plaintiffs' proposed construction is consistent with the term's plain language.

Defendant takes issue with Plaintiffs' use of the words "improvement of self-control of behavior" as a proxy for "improvement of behavioral disinhibition." (This dispute re-occurs in numerous other claim terms as well). The reality is that "disinhibition" means lack of inhibition or lack of self-control. These words are synonymous and Plaintiffs' proposed construction is the plain and ordinary meaning. *See also* Section IV.B.2 below for further discussion of "lack of self-control."

      **c.**      **The Specification Supports Plaintiffs' Proposed Construction**

The concept of "control of behavior" appears throughout the specification -- with the theme being that the new treatment set forth in the patent helps to improve control -- to improve behavioral disinhibition.

For instance, when discussing the diseases and symptoms that are to be treated (the "disinhibitions") the patent repeatedly speaks of (explicitly or implicitly) "uncontrolled" or out of control behaviors:

> "The symptoms improved by guanfacine treatment include, but are not limited to: agitation, **hyperactivity**, distractibility, inattention, impulsivity, disorganization, **uncontrolled** aggression, **self-mutilation**, and **uncontrolled** movements."

'290 Patent, col. 3, lines 7-11 (emphases added).  Similarly, at Column 7, lines 43-45, the '290 Patent states that after treatment with guanfacine:

> "The animals appeared more focused, calm, and **in control of their behavior**."  (emphasis added).

It is the common theme of these illnesses and symptoms that they are manifested by behaviors that are, in common vernacular, "out of control."  That is what is meant by "disinhibition."  The treatment produces improvement in self-control.  Plaintiffs' construction expresses that plain and ordinary meaning.

      **3.**      **The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "inhibiting a disinhibitory behavior"**

Independent claim 7 of the '290 patent recites the disputed claim term "inhibiting a disinhibitory behavior."[30]

---

[30] Braunel Decl. Ex. 1, '290 patent, col. 12, l. 48.

### a.     The Parties' Proposed Constructions

| "inhibiting a disinhibitory behavior" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| improving any symptom associated with <u>**lack of self-control of behavior**</u>, such symptoms including but not limited to agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, and uncontrolled movements | <u>**retarding, arresting or restraining**</u> a <u>**behavioral disinhibition symptom**</u>, such symptom including but not limited to agitation, hyperactivity, distractability, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, or uncontrolled movements<br><br>Note: Sandoz agrees to change "retarding, arresting or restraining" to "improving" |

### b.     The Plain Language of the Claim Supports Plaintiffs' Proposed Construction

The parties have agreed that the first words of Plaintiffs' construction should replace those of Defendant's -- thus the construction should begin with "improving any symptom associated with."

The sole dispute here again centers around Plaintiffs' use of the term "lack of self-control of behavior" versus Defendant's use of "behavioral disinhibition."  Again, as explained above, Plaintiffs believe these terms are synonymous and that the "lack of self-control" provides a plain-meaning definition for the words in the claim -- which Defendant simply repeats without defining.

### c.     The Specification Supports Plaintiffs' Proposed Construction

For the reasons expressed in Section IV.B.2 the specification supports Plaintiffs' construction.

### 4. The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "a behavior inhibiting dose of guanfacine"

Independent claims 1 and 7 of the '290 patent recite the disputed claim term "a behavior inhibiting dose of guanfacine."[31]

#### a. The Parties' Proposed Constructions

| "a behavior inhibiting dose of guanfacine" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| an amount of guanfacine that improves self-control of behavior | plain meaning, i.e., an amount of guanfacine that improves behavioral disinhibition |

The dispute here between the parties here -- as in the preceding Section IV.B.2 above -- relates to whether "behavioral disinhibition" should be construed as lack of self-control of behavior. For all the reasons expressed above, it should be so construed.

### 5. The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "treating a behavioral disinhibition"

Independent claim 1 of the '290 patent recites the disputed claim term "treating a behavioral disinhibition."[32]

#### a. The Parties' Proposed Constructions

| "treating a behavioral disinhibition" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| treating a disorder having prominent symptoms of **lack of self-control of behavior** including but not limited to Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, or the | **combating or curing** a disorder having prominent symptoms of **behavior disinhibition**, such disorders including but not limited to Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch- |

---

[31] Braunel Decl. Ex. 1, '290 patent, col. 12, ll. 32-33, 49-50.
[32] Braunel Decl. Ex. 1, '290 patent, col. 12, ll. 29.

| lack of self-control of behavior accompanying Post-Traumatic Stress Disorder or Dementia | Nyhan Syndrome, Post-Traumatic Stress Disorder or dementia |
| --- | --- |
| | Note: Sandoz agrees to change "combating or curing" in its construction to "treating" |

Again, the only dispute here (after the meet-and-confer process) between the parties -- as in the Section IV.B.2 above -- relates to whether "behavioral disinhibition" should be construed as lack of self-control of behavior.  For all the reasons expressed above, it should be so construed.

### C.  The Court Should Adopt Plaintiffs' Proposed Constructions for the Disputed Terms of the '599 and '794 Patents

Plaintiffs construe the disputed terms of the '599 and '794 patents according to their plain and ordinary meaning in light of the disclosures in the specification.  As such, the Court should adopt Plaintiffs' proposed definitions, which are in accord with the legal principles governing claim construction.

### 1.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5"

Independent claim 1 of the '599 patent and independent claims 3 and 8 of the '794 patent recite a "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5."[33]

---

[33] Braunel Decl. Ex. 2, '599 patent, col. 7, ll. 39-41; *see* Braunel Decl. Ex. 3, '794 patent, col. 15, ll. 24-27, col. 16, l. 22-24.

a.      **The Parties' Proposed Constructions**

| "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5" | |
| --- | --- |
| **Plaintiffs** | **Sandoz** |
| agent that increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 relative to an environment that has a pH of 5.5 or below | a substance that increases the rate of release of a pharmaceutically active agent from a composition in surrounding media having a pH above 5.5 |

b.      **Plaintiffs' Proposed Construction Is Consistent with the Plain Language of the Term "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5"**

Plaintiffs construe "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5" to mean an "agent that increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 relative to an environment that has a pH of 5.5 or below." Plaintiffs' proposed construction is consistent with the term's plain language, as shown in the table below.

| **Term's Plain Language** | **Corresponding Language in Plaintiffs' Proposed Construction** |
| --- | --- |
| agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5 | agent that increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 … |
| pH dependent | agent that increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 **relative to an environment that has a pH of 5.5 or below** |

### c.   The '599 and '794 Patent Specifications Support Plaintiffs' Proposed Construction

The '599 and '794 patent specifications disclose that, similar to the pharmaceutically active agent's solubility,[34] pharmaceutical compositions containing weakly basic pharmaceutically active agents have faster dissolution profiles in the more acidic environment of simulated stomach fluid and slower dissolution profiles in the less acidic environment of simulated intestinal fluid.[35] The '599 and '794 patent specifications disclose that a goal of the invention is to create formulations with pH-independent dissolution profiles.[36] Because weakly basic drugs tend to have slower dissolution profiles in a less acidic environment, the inventive formulations contain a pH dependent agent that creates a faster dissolution profile in this less acidic environment.[37] The pH dependent agents exemplified in the specification fall into three broad categories: (1) pH-dependent swelling polymers, (2) enteric agents, and (3) agents that increase the solubility of the pharmaceutically active agent, e.g., organic acids.[38]

Example 1 of the '599 and '794 patents shows that each of these types of pH-dependent agents increase the percent of the pharmaceutically active agent dissolved in a medium having pH 6.8 relative to in a medium having pH 1.2.[39] Table 1 of the '599 and '794 patents[40] shows

---

[34] Solubility is the amount of the pharmaceutically active agent that dissolves in a given volume of dissolution medium. *See* section IV.C.5. For example, to measure the impact of pH on the solubility of anagrelide hydrochloride, the drug substance would be dissolved in multiple dissolution media having varying pH, as shown in Illustration 1, A-1. Figure 1 of the '599 and '794 patents plots the results of such a test and shows that anagrelide hydrochloride is more soluble in a more acidic medium (having lower pH) than in a less acidic medium (having higher pH). '599 and '794 patents, col. 1, ll. 40-43, Fig. 1; *see also* Illustration 2, A-2 (partial reproduction of '599 and '794 patent Figure 1 with annotations).

[35] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 1, ll. 40-43.

[36] Braunel Decl. Ex. 2, '599 patent, col. 1, ll. 24-30.

[37] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 1, ll. 24-39.

[38] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 2, ll. 8-34.

[39] Braunel Decl. Ex. 2, '599 patent, col. 4, l. 9-col. 5, l. 38; Braunel Decl. Ex. 3, '794 patent, col. 4, l. 53-col. 7, l. 3.

[40] *See also* Illustration 2, A-2 (partial reproduction of Figure 1 with annotations).

the formulations for six different guanfacine hydrochloride tablets.[41]  The first two tablet

formulations (22A and 25B) are controls.[42]  The next four tablet formulations are inventive

formulations containing sodium alginate (28B),[43] carrageenan (39A),[44] fumaric acid (32B),[45] or

Eudragit L100-55 and Carbopol 974P (32D).[46]

Tablets made according to each of the formulations in Table 1[47] were dissolved in two

different dissolution media, the first having a more acidic pH of 1.2 and the second having a less

acidic pH of 6.8.[48]  Dissolution data for each tablet in each solution was recorded and reported in

Table 2 of the '599 and '794 patents.[49]  As discussed in detail below, a comparison of the

dissolution profiles of the inventive formulations, to the dissolution profiles of the control

formulations, supports Plaintiffs' proposed construction.

i.     **The pH Dependent Agent Increases the Rate of Release of the Pharmaceutically Active Agent from a Tablet at a pH in Excess of 5.5**

The first portion of Plaintiffs' proposed construction requires that the pH dependent agent

"increases the rate of release of the pharmaceutically active agent from a tablet in an

environment that has a pH above 5.5." Comparing the dissolution profiles for the inventive

formulations to the dissolution profiles of the control formulations at pH 6.8 (which is a pH

---

[41] Braunel Decl. Exs. 2-3, '599 and '794 patents, Table 1.  The formulations are labeled PD0052-22A, PD0052-25B, PD0052-28B, PD0052-32B, PD0052-32D, and PD0052-39A.  Since all formulations share the "PD0052" prefix, they are referred to in the brief and appendices by the last three digits of the formulation number.

[42] Braunel Decl. Exs. 2-3, '599 and '794 patents, Table 1, double rows under PD0052-22A and PD0052-25B.

[43] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 2, ll. 19-21.

[44] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 2, ll. 19-21.

[45] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 2, ll. 30-34.

[46] Braunel Decl. Exs. 2-3 '599 and '794 patents, Table 1; Illustration 3, A-3.

[47] Braunel Decl. Ex. 2, '599 patent, col. 4, ll. 11-21.

[48] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 1, ll. 24-27, Braunel Decl. Ex. 2, '599 patent, col. 4, ll. 63-65, Braunel Decl. Ex. 3, '794 patent, col. 5, ll. 37-39.

[49] *See* Braunel Decl. Exs. 2-3, '599 and '794 patents, Table 2.  *See also*, Illustration 4, A-4 (partial reproduction of Table 2 with annotations).

above 5.5), demonstrates this increase.  For example, the dissolution data for the inventive

formulation containing fumaric acid (32B) and the first control formulation (22A) is plotted in

Illustration 5, below.[50]  Illustration 5 shows that the fumaric acid formulation has a faster

dissolution profile than the control formulation, which indicates that fumaric acid increases the

rate of release of the pharmaceutically active agent from the tablet.[51]



## pH 6.8

For example, the fumaric acid formulation (32B) is about 60% dissolved at four hours while the

control formulation (22A) is only about 30% dissolved.  The dissolution data for the other

formulations follows a similar pattern and is plotted in Illustrations 6-21.[52]  Therefore, Example

1 of the '599 and '794 patents supports the portion of Plaintiffs' proposed construction, which

---

[50] A-5.
[51] Id.

states that the pH dependent agent "increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5."

ii.   **The pH dependent agent "increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 <u>relative to an environment that has a pH of 5.5 or below</u>**

The phrase "pH dependent" in the '599 and '794 patents means that the agent increases the release rate of the pharmaceutically active agent more in higher pH (less acidic) environments than in lower pH (more acidic) environments. Example 1 of the '599 and '794 patents indicates that the pH dependent agent increases the release rate of the pharmaceutically active agent more in an environment having pH 6.8 (above 5.5) than in an environment having pH 1.2 (below 5.5).[53] Illustrations 6-7 show that fumaric acid causes a greater increase in the percentage of the pharmaceutically active agent dissolved at pH 6.8 (gray chart) than at pH 1.2 (white chart).[54]

| **Guanfacine Hydrochloride Tablet Dissolution Data** **Fumaric Acid Formulation (32B) v. First Control Formulation (22A)** |
| --- |
| **Illustration 6** |

---

[52] A-6-13.

[53] Braunel Decl. Ex. 2, '599 patent, col. 4, l. 12-col. 5, l. 37; Braunel Decl. Ex. 3, '794 patent, col. 4, l. 55-col. 7, l. 3.

[54] Illustration A-6.





Illustrations 6-7 indicate that fumaric acid <u>increased</u> the rate of release of the

pharmaceutically active agent in an environment with a pH above 5.5 (the medium having pH

6.8 shown in gray) relative to the rate of release in an environment having pH below 5.5 (the

medium having pH 1.2 shown in white). The dissolution data for the other inventive

formulations disclosed in Table 1 follows the same pattern.[55] Therefore, Example 1 of the '599

and '794 patents supports Plaintiffs' proposed construction, which states that the pH dependent

agent "increases the rate of release of the pharmaceutically active agent from a tablet in an

environment that has a pH above 5.5 relative to an environment that has a pH of 5.5 or below."

> **2.      The Court Should Adopt Plaintiffs' Proposed Construction for the
>            Disputed Term "polymer that swells at a pH in excess of 5.5"**

Dependent claim 2 of the '599 patent and dependent claims 4 and 9 of the '794 patent

recite a "polymer that swells at a pH in excess of 5.5."[56]

> **a.      The Parties' Proposed Constructions**

| "polymer that swells at a pH in excess of 5.5" | |
| --- | --- |
| **Plaintiffs** | **Sandoz** |
| molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below | plain meaning, i.e., a molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in surrounding media having a pH above 5.5 |

> **b.      The Intrinsic and Extrinsic Evidence Supports Plaintiffs'
>            Proposed Construction for the Disputed Term "polymer that
>            swells at a pH in excess of 5.5"**

The disputed term regarding a swelling polymer contains three major components: (1) a

polymer; (2) that swells; (3) at a pH in excess of 5.5. Plaintiffs' proposed construction reflects

the ordinary meaning of the words "polymer" and "swells." "Polymer" means "molecules with

---

[55] Illustrations 8-21, A-7-13.

[56] Braunel Decl. Ex. 2, '599 patent, col. 7, ll. 42-44; Braunel Decl. Ex. 3, '794 patent, col. 15, ll. 31-33, col. 16, ll. 25-27.

many units joined to each other through chemical covalent bonds, often in a repeating manner."[57] "Swells" means "to expand (as in size, volume, or numbers) gradually beyond a normal or original limit."[58]

The '599 and '794 patents indicate that the words "swells at a pH in excess of 5.5" mean that the polymer "expands in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below." The patent specifications disclose that sodium alginate and carrageenan are examples of such polymers.[59] Example 1 of these patents indicates that sodium alginate and carrageenan increase the release rate of the pharmaceutically active agent in an environment with a pH above 5.5.[60] Therefore, the patents indicate that these polymers swell to a greater extent in a less acidic environment, as reflected in Plaintiffs' proposed construction.

**3. The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5"**

Claim 4 of the '599 patent recites an agent that "increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5."[61]

---

[57] Braunel Decl. Ex. 9, p. 355.
[58] Braunel Decl. Ex. 8, p. 1191.
[59] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 2, ll. 8-22.
[60] *See* section IV.C.2, above; Illustrations 10-17, A-8-12.
[61] Braunel Decl. Ex. 2, '599 patent, col. 7, ll. 47-50.

a.      **The Parties' Proposed Constructions**

| **"agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5"** | |
| --- | --- |
| **Plaintiffs** | **Sandoz** |
| agent that increases the amount of the pharmaceutically active agent that will dissolve in a given amount of another substance in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below | a substance that increases the amount of a pharmaceutically active agent that will dissolve when the surrounding media has a pH above 5.5 |

b.      **The Intrinsic and Extrinsic Evidence Supports Plaintiffs' Proposed Construction for the Disputed Term "agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5"**

Plaintiffs' proposed construction for the disputed term regarding an agent that increases solubility of the pharmaceutically active agent is consistent with the ordinary meaning of the word "solubility." "Solubility" means "the amount of a substance that will dissolve in a given amount of another substance."[62]

Additionally, the '599 and '794 patent specifications support Plaintiffs' proposed construction. In Figure 1, the solubility profile for anagrelide hydrochloride is expressed as the number of milligrams of anagrelide hydrochloride—the amount of the pharmaceutically active agent—that dissolve in one milliliter—a given amount—of solvent.[63] Therefore, the patent specifications measure solubility as the amount of the pharmaceutically active agent that dissolves in a given amount of another substance.

Additionally, the '599 and '794 patents indicate that the agent increases the solubility of the pharmaceutically active agent "in an environment which has a pH above 5.5 relative to an

---

[62] Braunel Decl. Ex. 8, p. 1119.

environment which has a pH of 5.5 or below." As discussed in section IV.C.2 above, Example 1 of the '599 and '794 patents indicates that the presence of fumaric acid results in a rate of release of the pharmaceutically active agent that is higher in an environment having pH 6.8 (above 5.5) relative to the rate of release in an environment having pH 1.2 (below 5.5).[64] The '599 and '794 patent specifications also disclose that fumaric acid is an agent that increases the solubility of the pharmaceutically active agent.[65] Therefore, the '599 and '794 patent specifications indicate that the agent that increases the solubility of the pharmaceutically active agent does so "in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below."

**4.    The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "agent that maintains an acidic microenvironment in the composition"**

Claim 13 of the '599 patent recites an "agent that maintains an acidic microenvironment in the composition."[66]

**a.    The Parties' Constructions**

| "agent that maintains an acidic microenvironment in the composition" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| agent that imparts an acidic character to the regions immediately around or in close proximity to the pharmaceutically active agent in the composition | a substance that imparts a greater acidic character in the regions immediately around or in close proximity to a pharmaceutically active substance than that of the surrounding media |

---

[63] Braunel Decl. Exs. 2-3, '599 and '794 patents, Fig. 1.

[64] Braunel Decl. Ex. 2, '599 patent, col. 4, l. 12-col. 5, l. 37; Braunel Decl. Ex. 3, '794 patent, col. 4, l. 55-col. 7, l. 3.

[65] Braunel Decl. Exs. 2-3, '599 and '794 patents, col. 2, ll. 28-34; *see also* section IV.C.2, Illustrations 6-9, A-6-7.

[66] Braunel Decl. Ex. 2, '599 patent, col. 8, ll.52-54.

**b.**     **The Intrinsic and Extrinsic Evidence Supports Plaintiffs' Proposed Construction for the Disputed Term "agent that maintains an acidic microenvironment in the composition"**

Plaintiffs construe "agent that maintains an acidic microenvironment in the composition" to mean "agent that imparts an acidic character to the regions immediately around or in close proximity to the pharmaceutically active agent in the composition." Plaintiffs' construction comports with the plain language of the term and the ordinary meaning of the word "microenvironment."

Regarding the plain language, the term includes acidity with respect to an environment in the composition. The usage of the term "microenvironment" as it relates to pH (e.g., acidity) in the pharmaceutical arts at the time of the filing of the '599 and '794 patents concerned the pH of a small area within a larger area or structure: "in the **immediate vicinity of the drug** the pH is raised . . . resulting in an alkaline **microenvironment around the drug particle.**"[67] Plaintiffs' construction of the disputed term is consistent with the plain language of the term and the ordinary meaning of words within the term.

The disclosures in the '599 and '794 patents further support Plaintiffs' construction of the disputed term concerning "microenvironment." Specifically, the specifications state that "organic acids maintain an acidic microenvironment in the tablet,"[68] and that such acids increase the solubility of the pharmaceutically active agent at a pH above 5.5.[69] From such disclosures, in view of the ordinary meaning of microenvironment in the context of pH, the person of ordinary skill in the art would understand that there is an interplay between the acid and the active agent, requiring the acid to be near the active and to provide an acidic environment for the active agent.

_____

[67] Braunel Decl. Ex. 7, p. 28 (emphasis added).
[68] '599 patent, col. 2, ll. 30-31; '794 patent, col. 2, ll. 30-31.
[69] *See* '599 patent, col. 2, ll. 28-29; '794 patent, col. 2, ll. 28-29.

According to the plain language of the term and the patent disclosures, this occurs in the composition that contains the active (e.g., in a tablet).  As such, Plaintiffs' proposed construction for the disputed term "agent that maintains an acidic microenvironment in the composition" is "agent that imparts an acidic character to the regions immediately around or in close proximity to the pharmaceutically active agent in the composition."  This proposed construction is consistent with the plain language of the term, the ordinary meaning of the words within the term, and the specifications of the '599 and the '794 patents.

> **5.  The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "reducing the likelihood of side effects associated with the administration of guanfacine"**

Independent claim 8 of the '794 patent recites "a method of reducing the side effects associated with the administration of guanfacine."[70]

> **a.   The Parties' Constructions**

| "reducing the likelihood of side effects associated with the administration of guanfacine" | |
| --- | --- |
| **Plaintiffs** | **Sandoz** |
| reducing the probability of side effects resulting from guanfacine administration | decreasing the incidence or severity of side effects compared to administering the same amount of guanfacine as an immediate-release composition |

> **b.   The Plain Language of the Claims Supports Plaintiffs' Proposed Construction for the Disputed Term "reducing the likelihood of side effects associated with the administration of guanfacine"**

Plaintiffs construe "reducing the likelihood of side effects associated with the administration of guanfacine" to mean "reducing the probability of side effects resulting from

---

[70] Braunel Decl. Ex. 3, '794 patent, col. 16, ll. 4-5.

guanfacine administration." Plaintiffs' construction comports with the plain language of the term and the ordinary meaning of the word "likelihood."

This claim term broadly reflects three concepts: (1) reducing the likelihood; (2) of side effects; (3) associated with the administration of guanfacine. Plaintiffs' construction is consistent with these three concepts: (1) reducing the probability; (2) of side effects; (3) resulting from guanfacine administration. It appears that the chief disagreement between the parties centers on the meaning of the word "likelihood." But this disagreement is easily resolved, because the plain meaning of the word "likelihood" is "probability,"[71] as reflected in Plaintiffs' definition.

Additionally, the '794 patent specification supports Plaintiffs' proposed construction. The specification states:

> When guanfacine hydrochloride is administered as part of a composition in accordance with the present invention, there is **a reduction in the number of side effects** associated with the administration of guanfacine hydrochloride, **or a reduction in the likelihood of side effects** associated with the administration of guanfacine hydrochloride.
> In accordance with **a further aspect of the present invention** there is provided a pharmaceutical composition comprising guanfacine as an active agent and characterized in that said composition when administered to a patient **produces less of the side effects** usually associated with guanfacine.[72]

Notably, this disclosure provides for three possibilities regarding the reduction of side effects. Namely: (1) that there is a reduction in the number of side effects; (2) that there is a reduction in the in the likelihood of side effects; or (3) that the severity of the side effects is lessened. As for the first two possibilities, they are intended to be options, as indicated by the use of the

---

[71] Braunel Decl. Ex. 10, p. 673.
[72] Braunel Decl. Ex. 3, '794 patent, col. 3, ll. 50-55 (emphasis added).

disjunctive "or" to separate and distinguish them.  The third possibility regarding the lessening of side effects is also an alternative, preserved as a "further aspect of the invention"[73].

The claim term at issue includes the language "reducing the likelihood of side effects," which restates the second option in the specification and is meant to be distinguished from the others.  The '794 patent specification further makes clear that the side effects are those associated with the pharmaceutically active agent guanfacine or its salt, guanfacine hydrochloride.[74]

Additionally, the pharmacokinetic data in Table 8 and Figure 2 of the '794 patent show a desirable pharmacokinetic profile for anagrelide hydrochloride formulations of the invention. Such pharmacokinetic profile displays a decreased maximum concentration of drug in plasma ($C_{max}$) and a later time of maximum concentration ($T_{max}$).  The person of ordinary skill in the art would understand that such pharmacokinetic parameters would result in reducing the probability of side effects of guanfacine administration.

Given the express language of the term and the plain meaning of the words in the term, taken together with the disclosures in the patent specification, the proper construction of the term "reducing the likelihood of side effects associated with the administration of guanfacine" is reducing the probability of side effects resulting from guanfacine administration.

_____

[73] Braunel Decl. Ex. 3, '794 patent, col. 3, ll. 56-57.
[74] Braunel Decl. Ex. 3, '794 patent, col. 3, ll. 50-55.

**6.**   **The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Term "pharmaceutically active agent that is pH dependent"**

Independent claim 1 of the '599 patent and independent claims 3 and 8 of the '794 patent recite a "pharmaceutically active agent that is pH dependent."[75]

**a.**   **The Parties' Constructions**

| "pharmaceutically active agent that is pH dependent" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| no construction needed—plain and ordinary meaning | a molecule that provides activity in the body and that has pH-dependent aqueous solubility |

**b.**   **The Plain Language of the Claims Supports Plaintiffs' Proposed Construction for the Disputed Term**

As Plaintiffs construction indicates, the claim term "pharmaceutically active agent that is pH dependent" consists of words that are common in the pharmaceutical arts and do not need construction. The words adequately and precisely speak for themselves.

By contrast Defendant's construction raises more confusion than it solves. A "molecule that provides activity in the body" raises new questions as to what "activity" is "provided." "Aqueous solubility" adds complexity to the claim in ways that are not called for by the plain words of the claim. There is simply no basis for adding Defendants' additional words to the plain language of the caims.

---

[75] Braunel Decl. Ex. 2, '599 patent, col. 7, ll. 34-35; Braunel Decl. Ex. 3, '794 patent, col. 15, ll. 10-11, col. 16, ll. 8-9.

### 7. The Court Should Adopt Plaintiffs' Proposed Construction for the Disputed Terms Relating to "about percentage weights"

Various dependent claims of the '599 patent recite that a particular component is "present in the composition in an amount of from about __ wt. % to about __wt. %."[76, 77,78, 79, 80, 81, 82.]

The dispute between the parties as regards these claim terms centers around the use of the word "about." Defendant wishes to give the word "about" a particular numerical value -- thus changing the actual number in the claim to a particular other number. Plaintiffs believe this is improper and that the word "about" is classically interpreted as meaning "approximately." As set forth in numerous cases, the word "about" is not indefinite when construed to mean "approximately" and generally should not be given a numerical value. *See, e.g., Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("ordinarily, a claim element that is claimed in general, descriptive words . . . is not limited to the numbers [set forth] in the specification or the other claims" "It is usually incorrect to read numerical precision into a claim from which it is absent"); *Ex parte Eastwood*, 163 USPQ 316, 317 (BPAI 1968) ("The descriptive word 'about' is not indefinite as argued by the examiner. Rather, the term is clear but flexible and is deemed to be similar in meaning to terms such as 'approximately' or 'nearly'."); *Ex parte King*, 82 USPQ 450, 451 (BPAI 1948) ("The propriety of the use of the expression 'about' in the claims to permit 'of some tolerance' . . . is established by long practice in the Patent Office, as shown by numerous patents . . . .").

---

[76] Braunel Decl. Ex. 2, '599 patent, col. 8, ll. 65-67.
[77] Braunel Decl. Ex. 2, '599 patent, col. 9, ll. 1-3.
[78] Braunel Decl. Ex. 2, '599 patent, col. 9, ll. 4-7.
[79] Braunel Decl. Ex. 2, '599 patent, col. 9, ll. 8-11.
[80] Braunel Decl. Ex. 2, '599 patent, col. 9, ll. 12-14.
[81] Braunel Decl. Ex. 2, '599 patent, col. 9, ll. 15-17.
[82] Braunel Decl. Ex. 2, '599 patent, col. 9, ll. 15-17.

a.        The Parties' Constructions

| "said pharmaceutically active agent is present in the composition in an amount of from about 0.1 wt. % to about 70 wt. %" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| the pharmaceutically active agent is present from approximately 0.1% by weight to approximately 70% by weight | plain meaning, the pharmaceutically active agent is present in the composition in an amount of from 0.05 wt. % to 75 wt. % |

| "said pharmaceutically active agent is present in the composition in an amount of from about 1 wt. % to about 40 wt. %" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| the pharmaceutically active agent is present from approximately 1% by weight to approximately 40% by weight | plain meaning, the pharmaceutically active agent is present in the composition in an amount of from 0.5 wt. % to 45 wt. % |

| "said non-pH-dependent sustained release agent is present in the composition in an amount of from about 5 wt. % to about 50 wt. %" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| the non-pH dependent sustained release agent is present from approximately 5% by weight to approximately 50% by weight | plain meaning, the non-pH dependent sustained release agent is present in the composition in an amount of from 4.5 wt. % to 55 wt. % |

| "said non-pH-dependent sustained release agent is present in the composition in an amount of from about 10 wt. % to about 30 wt. %" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| the non-pH dependent sustained release agent is present from approximately 10% by weight to approximately 30% by weight | plain meaning, the non-pH dependent sustained release agent is present in the composition in an amount of from 5 wt. % to 35 wt. % |

| "said at least one pH-dependent agent is present in the composition in an amount of from about 0.5 wt. % to about 40 wt %" | |
|---|---|
| **Plaintiffs** | **Sandoz** |
| the pH dependent agent is present from approximately 0.5% by weight to | plain meaning, at least one pH-dependent agent is present in the composition in an amount of |

| approximately 40% by weight | from 0.45 wt. % to 45 wt. % |
|---|---|
| **"said at least one pH-dependent agent is present in the composition in an amount of from about 1 wt. % to about 20 wt. %"** | |
| **Plaintiffs** | **Sandoz** |
| the pH dependent agent is present from approximately 1% by weight to approximately 20% by weight | plain meaning, at least one pH-dependent agent is present in the composition in an amount of from 0.5 wt. % to 25 wt. % |

We urge that defendants have arbitrarily chosen to inject a +/- 0.5 wt.% construction into every claim term that has the word "about" in it. This random construction makes no sense for any single parameter that is being measured for its percent-weight. It makes even less sense that many different parameters (different chemical entities), in different claims, should all be +/- 0.5%, irrespective of the chemical entity being assigned a percent-weight.

## V.      Conclusion

For at least the reasons set forth above, the Court should adopt Plaintiffs' proposed constructions for the disputed claim terms of the '290, '599, and '794 patents.

Respectfully submitted,

DAVIS GRAHAM & STUBBS LLP

By: /s Thomas Bell/
Thomas C. Bell
1550 Seventeenth St.
Suite 500
Denver, Colorado  80202
Email: tom.bell@dgslaw.com
Telephone: (303) 892-9400
Facsimile: (303) 893-1379

Of Counsel:
Edgar H. Haug
Sandra Kuzmich
Jason Lief (Pro Hac Vice motion to be filed)

Frommer Lawrence & Haug LLP
745 Fifth Avenue
New York, New York 10151
Email: ehaug@flhlaw.com
Email: skuzmich@flhlaw.com
Email: jlief@flhlaw.com
Email: rbardenstein@flhlaw.com
Telephone: (212) 588-0800
Facsimile: (212) 588-0500

Gregory F. Wesner
Elizabeth J. Weiskopff
Frommer Lawrence & Haug LLP
1191 2nd Avenue
Suite 2000
Seattle, Washington 98101
Email: gwesner@flhlaw.com
Email: eweiskopff@flhlaw.com
Tel: (206) 336-5690
Fax: (206) 336-5691

Bryan Braunel (Pro Hac Vice motion to be filed)
Rami Bardenstein
Frommer Lawrence & Haug LLP
1667 K Street NW
Suite 500
Washington DC 20006
Email: bbraunel@flhlaw.com
Email: rbardenstein@flhlaw.com
Tel: (202) 292-1530
Fax: (202) 292-1531

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Thomas C. Bell, hereby certify that on February 3, 2012, I served a true and correct

copy of **PLAINTIFFS' OPENING BRIEF ON CLAIM CONSTRUCTION** on the counsel of

record listed below in the manner indicated:

Edward C. Stewart
Wheeler Trigg O'Donnell LLP
1801 California Street, Suite 3600
Denver, Colorado 80202
Telephone:  303.244.1800
Facsimile:  303.244.1879
E-mail: stewart@wtotrial.com

and

Richard T. Ruzich
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603-3433
Telephone:  312.499.6783
Facsimile:  312.896.5652
Email:  rtruzich@duanemorris.com

Laura A. Vogel
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA  02110
Telephone:  857-488-4284
Facsimile:  857-401-3045
Email:  lavogel@duanemorris.com

*Attorneys for Defendant Sandoz Inc.*

s/ *Thomas Bell*
Thomas C. Bell