IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:11-cv-01110-RBJ-KMT

SHIRE LLC,
SUPERNUS PHARMACEUTICALS, INC.,
SHIRE DEVELOPMENT INC.,
SHIRE INTERNATIONAL LICENSING BV,
AMY F.T. ARNSTEN, PH.D.,
PASKO RAKIC, M.D., and
ROBERT D. HUNT, M.D.,

       Plaintiffs,

v.

SANDOZ INC.,

       Defendant.

---

## SANDOZ INC.'S OPENING CLAIM CONSTRUCTION BRIEF

---

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

I. INTRODUCTION ......................................................................................................1

II. TECHNICAL BACKGROUND OF THE PATENTS-IN-SUIT .........................................2

 A. The '290 Patent:  Method of Treating Disorders with Behavioral
  Disinhibition Symptoms ..................................................................................2

 B. The '599 and '794 Patents:  pH-Independent or Minimally
  Dependent Sustained Release Pharmaceutical Compositions ................................4

III. PRINCIPLES OF CLAIM CONSTRUCTION ..................................................................5

IV. ARGUMENT ..............................................................................................................7

 A. Disputed Claim Terms in the '290 Patent.........................................................7

  1. "treating a behavioral disinhibition"....................................................7

  2. "inhibiting a disinhibitory behavior" ....................................................9

  3. "a behavior inhibiting dose of guanfacine" .............................................10

  4. "without inducing excessive sedation" ....................................................11

  5. "readministering a dose at an interval required to obtain a
   desired level and duration of behavioral inhibition"................................15

 B. Disputed Claim Terms in the '599 and '794 Patents ...........................................16

  1. "pharmaceutically active agent that is pH dependent" .............................17

  2. "pH dependent agent that increases the rate of release of
   said pharmaceutically active agent from the tablet at a pH
   in excess of 5.5".................................................................................19

  3. "polymer that swells at a pH in excess of 5.5" ........................................22

  4. "agent that increases the solubility of at least one
   pharmaceutically active agent at a pH of greater than 5.5" .......................23

  5. "agent that maintains an acidic microenvironment in the
   composition".....................................................................................23

  6. "about" ............................................................................................26

  7. "reducing the likelihood of side effects associated with the
   administration of guanfacine".............................................................27

V. CONCLUSION.........................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chimie v. PPG Indus., Inc.*
402 F.3d 1371 (Fed. Cir. 2005)..................................................................................6

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*
460 F.3d 1349 (Fed. Cir. 2006)............................................................................. 6-8

*Hoechst Celanese Corp. v. B.P. Chemis. Ltd.*
78 F.3d 1575 (Fed. Cir. 1996)................................................................................12

*Markman v. Westview Instruments, Inc.*
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 115 S.Ct. 1384 (1996) ................................5

*Pall Corp. v. Micron Separations, Inc.*
66 F.3d 1211 (Fed. Cir. 1995)................................................................................26

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005)........................................................... 5-7, 12, 14

*Renishaw PLC v. Marposs Societa*
158 F.3d 1243, 1250 (Fed. Cir. 1998)....................................................................15

*Tivo, Inc. v. Echostar Comms. Corp.*
No. 2:04-cv-1, 2005 U.S. Dist. LEXIS 46879 (E.D. Tex. Aug. 18, 2005)..................24, 28

*U.S. Surgical Corp. v. Ethicon, Inc.*
103 F.3d 1554 (Fed. Cir. 1997).............................................. 8, 15, 24, 27-28

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576 (Fed. Cir. 1996)...........................................................................6, 12, 21

**Other Authorities**

Harvey, D., Modern Analytical Chemistry (McGraw Hill 1996)................................................26

Hunt, R.D. et al., Clonidine Benefits Children with Attention Deficit Disorder and Hyperactivity: Report of a Double Blind Placebo-Controlled Crossover Study, 24 J. Am. Acad. Psych., 5:617-29 (1985) ................................................................................................3

Hunt, R.D. et al., Clonidine in Child and Adolescent Psychiatry, J. Child & Adol. Psychopharm., 1:87-101 (1990) ................................................................................................3

## I.    INTRODUCTION

In this case, Plaintiffs assert all three U.S. patents they listed in the FDA's Orange Book (Approved Drug Products with Therapeutic Equivalence Evaluation) for Plaintiffs' New Drug Application (NDA) for its guanfacine hydrochloride extended release tablet product (branded as INTUNIV®).   (Doc. No. 1 ¶¶ 11-13.)[1]   Specifically, Plaintiffs assert claims 1, 2, 4-8, and 10-12 of U.S. Patent Number 5,854,290 ("the '290 patent," attached hereto as Exhibit A); claims 1, 3-6, 8, 10-23, 25, 29, and 30 of U.S. Patent Number 6,287,599 ("the '599 patent," attached hereto as Exhibit B); and claims 3, 6-8, 11, and 12 of U.S. Patent Number 6,811,794 ("the '794 patent," attached hereto as Exhibit C).   (See Letter from Bell to Ruzich (Sept. 22, 2011) (providing preliminary list of asserted claims), attached hereto as Exhibit D.)

The parties have agreed on the meanings of a number of terms recited in the asserted claims, and Sandoz requests that the Court incorporate these agreed-upon definitions, set forth in Exhibit E attached hereto, into the Court's claim construction order.   There remain twelve disputed claim terms for the Court to construe:

| Claim Term | Patent | Claims |
|---|---|---|
| treating a behavioral disinhibition | '290 | 1-6 |
| inhibiting a disinhibitory behavior | '290 | 7-12 |
| a behavior inhibiting dose of guanfacine | '290 | 1-12 |
| without inducing excessive sedation | '290 | 1-12 |
| readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition | '290 | 2, 8 |

---

[1] This case No. 1:11-cv-01110 involves the 4 mg dosage strength of Sandoz's proposed generic guanfacine hydrochloride extended release tablet product.  Case No. 1:12-cv-00040 involves the 1, 2, and 3 mg dosage strengths of Sandoz's proposed guanfacine product.  Sandoz's Answer in the latter case is currently due on March 13, 2012.  (Doc. No. 11.)  The same patents (and presumably the same patent claims) are asserted in both cases, and Sandoz anticipates that these cases will eventually be consolidated for efficiency.

| pharmaceutically active agent that is pH dependent | '599 | 1-30 |
| | '794 | 3-12 |
| pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5 | '599 | 1-30 |
| | '794 | 3-12 |
| polymer that swells at a pH in excess of 5.5 | '599 | 2, 9, 28 |
| | '794 | 4-5, 9-10 |
| agent that increases the solubility of at least one pharmaceutically active agent at a pH of greater than 5.5 | '599 | 4, 11-12, 14 |
| agent that maintains an acidic microenvironment in the composition | '599 | 13 |
| about *in numeric ranges* | '599 | 18-23 |
| reducing the likelihood of side effects associated with the administration of guanfacine | '794 | 8-12 |

## II.   TECHNICAL BACKGROUND OF THE PATENTS-IN-SUIT

### A.   The '290 Patent:  Method of Treating Disorders with Behavioral Disinhibition Symptoms

The '290 patent claims a method of treatment.   (Ex. A, '290 patent Abstract.) Specifically, the '290 patent is directed to the use of guanfacine in a method for treating disorders with symptoms of "behavioral disinhibition" in a primate with "minimal sedative side effects."   (*Id.*)   Such disorders include Attention-Deficit Hyperactivity Disorder ("ADHD"), Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, and the disinhibitory symptoms accompanying Post-Traumatic Stress Disorder and dementia. (*Id.*)

The Background of the Invention section of the '290 patent provides a general discussion of what was known at the time of the alleged invention, with several citations to representative prior art references.   (*Id.* at 1:10 – 2:63.)   This section discusses treatment of "disinhibited behaviors" that are symptoms associated with ADHD and other disorders, such as inattention, disorganization, impulsivity, distractibility, hyperactivity, inappropriate aggression, inappropriate movements, agitation, wandering, self-mutilation, and uncontrolled movements.

2

(*Id.* at 1:10-48; *see also id.* at 3:7-11.)  One known treatment for these disorders and symptoms was administration of the amphetamine-like compound methylphenidate (branded as, *e.g.*, Ritalin®).  (*Id.* at 1:53-57.)

Another common treatment for ADHD and related disorders in the prior art was administration of the compound clonidine.  (*Id.* at 2:5-28.)  Clonidine is an alpha-2 adrenergic agonist, *i.e.*, a stimulating agent that acts preferentially on presynaptic alpha-2 neurons to inhibit the stimulation by or release of norepinephrine.  (*Id.* at 2:5-10 (citing Hunt, R.D. et al., Clonidine Benefits Children with Attention Deficit Disorder and Hyperactivity: Report of a Double Blind Placebo-Controlled Crossover Study, 24 J. Am. Acad. Child Psych., 5:617-29 (1985)), attached hereto as Exhibit F.)  The '290 patent states that one of the side effects of greater than moderate doses of clonidine is "excessive sedation" (*id.* at 2:13-16, 40-44), which a cited prior art reference describes as most problematic during the first 2 to 4 weeks of treatment, decreasing progressively thereafter, and leading to discontinued use in only 10% of children receiving the treatment (Hunt, R.D. et al., Clonidine in Child and Adolescent Psychiatry, J. Child & Adol. Psychopharm., 1:87-101, at 94 (1990), attached hereto as Exhibit G).

Like clonidine, guanfacine is also an alpha-2 adrenergic agonist.  (Ex. A, '290 patent 2:29-30.)  Guanfacine was a known antihypertensive agent, approved by the FDA for use as a blood pressure medication (branded as Tenex®) long before the application for the '290 patent was filed.  (*Id.* at 3:49-52.)  The alleged invention claimed by the '290 patent is the use of guanfacine as a treatment of "behavioral disinhibition" in a primate "without inducing excessive sedation," such as that observed with greater than moderate doses of clonidine.  (*Id.* at 3:66 – 4:19, 2:40-44.)

**B.     The '599 and '794 Patents:  pH-Independent or Minimally Dependent Sustained Release Pharmaceutical Compositions**

The '599 and '794 patents claim sustained release formulations of pharmaceutical products, specifically including guanfacine products.  (Exs. B & C, '599 & '794 patents Abstract.)  Both patents are directed to compositions whose principal attribute is "a pH-independent or a minimized pH-dependent dissolution profile."  (*Id.* at 1:7-8.)

Although they are not technically "related applications" by PTO priority standards, the '599 and '794 patents share a common description of the context for the formulations they claim. (*Compare* Ex. B, '599 patent 1:1 – 4:4, *with* Ex. C, '794 patent 1:1 – 3:39 (identical text).)  The patents start with the premise that the solubility and rate of dissolution of an active pharmaceutical ingredient ("API"), like guanfacine, changes when the pH of its environment changes.  (Exs. B & C, '599 & '794 patents 1:17-20.)  According to the patents, "pH-dependent dissolution [of an API] is an undesirable product characteristic."  (*Id.* at 1:21-22.)  Thus, one of the objects of the claimed formulations is to provide a "composition with a minimized pH dependent or pH-independent dissolution profile."  (*Id.* at 1:28-30.)

To achieve this object, both patents are directed to compositions that have a common formulation with at least three basic components: (a) at least one pharmaceutically active agent that is pH dependent, (b) at least one non-pH dependent sustained release agent, and (c) at least one pH dependent agent that increases the dissolution rate of the at least one pharmaceutically active agent at a pH in excess of 5.5.  (Ex. B, '599 patent Abstract, cl. 1 (sole independent claim); Ex. C, '794 patent Abstract, cls. 3 & 8 (only asserted independent claims).)  In this common formulation, the patents state that component (a)—the pH-dependent pharmaceutically active agent—may be guanfacine hydrochloride (Exs. B & C, '599 & '794 patents 1:44, 51-52), but "is not to be limited to any particular pharmaceutically active agent" (*id.* at 1:54-57).

Regarding component (b)—the non-pH dependent sustained release agent—the patents provide several specific examples (*id.* at 1:58 – 2:1), but state that this component "is not to be limited to any particular non-pH-dependent sustained release agents" (*id.* 2:6-7).  Regarding component (c)—the pH-dependent agent that increases the dissolution rate of component (a) at a pH greater than 5.5—the patents state that this component may be, among other things, (i) polymers that swell at a pH greater than 5.5, (ii) enteric agents, or (iii) agents that increase solubility by maintaining an acidic microenvironment in a tablet containing the composition, such as, *e.g.*, organic acids.  (*Id.* at 2:8-15.)  The patents provide specific examples of such polymers and agents, but none of the lists of these specific examples is said to be exhaustive.  (*Id.* at 2:19-34.)

Beyond the common formulation of three basic components, the patents state that the claimed compositions may also include "other materials, such as bulking agents, disintegrating agents, anti-adherants and glidants, lubricants, and binding agents."  (*Id.* at 2:35-38.)  The patents provide specific examples of such other materials, but none of the lists of these specific examples is said to be exhaustive.  (Ex. B, '599 patent 2:39 – 4:4; Ex. C, '794 patent 2:39 – 3:38.)

## III.   PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is a matter of law exclusively for the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-971 (Fed. Cir. 1995) (en banc), *aff'd* 115 S.Ct. 1384 (1996).  The Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.* provides a roadmap for claim construction.  415 F.3d 1303 (Fed. Cir. 2005).

The Court should begin its claim construction analysis with the words of the claim.  Claim terms should be given their ordinary and customary meaning, which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention *i.e.,* as of the effective filing date of the patent application.  *Id.* at 1313-14 ("[T]he

claims themselves provide substantial guidance as to the meaning of the particular claim terms."). Because claim terms are often used "consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. *Id.* at 1314.

Next, the Court must consider the rest of the intrinsic evidence, including the specification and prosecution history. *Id.* at 1313-14. A person of ordinary skill in the art should view the ordinary meaning of the claim terms within "the context of the entire patent, including the specification." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006) (quoting *Phillips,* 415 F.3d at 1313). The specification is always relevant to the claim construction analysis and is usually the single best guide to the meaning of the disputed term. *Phillips*, 415 F.3d at 1315. Where the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," it is "the inventor's lexicography" that governs. *Id.* at 1316. The prosecution history of the patent also should be considered by the Court to determine "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." *Id.* at 1317 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996)). The Court should consult the prosecution history in order to "exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005).

Finally, the Court may consider extrinsic evidence, if necessary, to resolve any ambiguity in a disputed claim term that was not resolved by consulting the intrinsic evidence. *Vitronics*, 90 F.3d at 1583. The Court may also consult extrinsic evidence to aid itself in understanding that general technology involved in the patent claims at issue, but not to vary or contradict the patent claims. *See Phillips*, 415 F.3d at 1316.

Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316.

## IV.   ARGUMENT

### A.   Disputed Claim Terms in the '290 Patent

#### 1.   "treating a behavioral disinhibition"

Claim 1 of the '290 patent (and claims 2-6 by dependency) recites in its preamble "[a] method of ***treating a behavioral disinhibition*** in a primate without inducing excessive sedation." The parties dispute the meaning of the italicized phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
| --- | --- |
| treating a disorder having prominent symptoms of ***behavioral disinhibition***, such disorders including but not limited to Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, Post-Traumatic Stress Disorder or dementia | treating a disorder having prominent symptoms of ***lack of self-control of behavior***, such disorders including but not limited to Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, Post-Traumatic Stress Disorder or dementia |

The parties' proposed constructions of "treating a behavioral disinhibition" are almost identical. The only difference in the two proposed constructions is that Sandoz's proposed construction includes the patentees' wording as used in the specification and claims, "behavioral disinhibition," while Plaintiffs' proposed construction replaces the patentees' language with the phrase "lack of self-control of behavior," which is unsupported by the specification of the '290 patent.

One of the bedrock principles of claim construction is that the specification of the patent is always relevant to the claim construction analysis and is usually the single best guide to the meaning of the disputed claim term. *See Conoco*, 460 F.3d at 1357 (quoting *Phillips*, 415 F.3d at

1315).  In this case, the specification of the '290 patent provides a detailed discussion of the types of "behavioral disinhibition" to be treated with claimed methods.  (*See, e.g.*, Ex. A, '290 patent 1:12 – 3:23.)  While there is no express definition of "behavioral disinhibition" in the '290 patent, the specification explains that some diseases have prominent symptoms of disinhibitory behavior, such as Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, Post-Traumatic Stress Disorder or dementia, but also provides some examples of such symptoms:

> The present invention features the use of an alpha-2A agonist for the treatment of behavioral disinhibition.  More particularly, the present invention relates to the improvement of behavioral inhibition in patients with Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, or the disinhibitory symptoms accompanying Post-Traumatic Stress Disorder or dementia following treatment with the alpha-2A agonist, guanfacine.  The symptoms improved by guanfacine treatment include, but are not limited to:  agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, and uncontrolled movements.

(*Id.* at 2:66 – 3:11.)  Thus, a person of ordinary skill would understand that "behavioral disinhibition" in the context of the '290 patent encompasses many symptoms associated with at least the diseases listed in the patent itself.  Although Plaintiffs cite to column 3, lines 1-7 of the '290 patent as support for their construction, there is nothing in the specification of the '290 patent to indicate that "behavioral disinhibition" is limited to "lack of self-control of behavior" as proposed by Plaintiffs.  In fact, the term "self-control" does not appear ***anywhere*** in the specification of the '290 patent.  Thus, Plaintiffs' inclusion of "lack of self-control of behavior" in their construction serves only to create potential confusion and ambiguity in determining the true scope of the asserted claims by importing new terminology, which is contrary to the goal of the claim construction process.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568

(Fed. Cir. 1997) (explaining that "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims").

Further, to limit "behavioral disinhibition" as recited in claims 1 and 6 of the '290 patent to "lack of self-control of behavior" would potentially exclude symptoms that were intended to be included by the use of the term "behavioral disinhibition," such as agitation, hyperactivity, distractibility, disorganization, and self-mutilation, all of which were clearly intended by the patentees to be included as symptoms of behavioral disinhibition, based on the passage quoted above. (*See* Ex. A, '290 patent 2:66 – 3:11.)  There is nothing in the '290 patent that suggests that these symptoms are characterized by "lack of self-control of behavior."  Thus, Plaintiffs' proposed construction would exclude symptoms of behavioral disinhibition described in the '290 patent, thus excluding embodiments of the claimed invention.  Reading the patent as a whole clearly conveys that such a contradiction was not intended by the patentees when they chose to use the term "behavioral disinhibition."  Thus, this Court should adopt Sandoz's construction because Plaintiffs' construction creates unnecessary confusion and ambiguity as to claim scope, and also contradicts the patentees' own description of the intended scope of the claimed invention.

2.      **"inhibiting a disinhibitory behavior"**

Claim 7 of the '290 patent (and claims 8-12 by dependency) recites in its preamble "[a] method of ***inhibiting a disinhibitory behavior*** in a primate without inducing excessive sedation." The parties dispute the meaning of the italicized phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| improving any ***behavioral disinhibition symptom***, such symptoms including but not limited to agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, and uncontrolled movements | improving any ***symptom associated with lack of self-control of behavior***, such symptoms including but not limited to agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, and uncontrolled movements. |

Once again, Plaintiffs' and Defendant's proposed constructions differ only in that Plaintiffs seek to substitute "lack of self-control of behavior" for the claim term "behavioral disinhibition," whereas Sandoz maintains the language chosen by the patentees in its proposed construction. As discussed above with regard to the term "treating a behavioral disinhibition," Plaintiffs provide no legitimate basis for substituting their new phrase "lack of self-control of behavior" for the term that appears in the claims and that was used by the patentees throughout the specification of the '290 patent, "behavioral disinhibition/disinhibitory behavior." The Court should adopt Sandoz's proposed construction, as it is derived from the patent itself and avoids the unnecessary confusion and ambiguity introduced by Plaintiffs' arbitrary selection of an unsupported new definition for this claim term.

### 3.   "a behavior inhibiting dose of guanfacine"

Claims 1 and 7 of the '290 patent (and claims 2-6 and 8-12 by dependency) recite "administering to [a] primate ***a behavior inhibiting dose of guanfacine***." The parties dispute the meaning of the italicized phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| an amount of guanfacine that improves behavioral disinhibition | an amount of guanfacine that improves self-control of behavior |

As with the terms above, Plaintiffs' and Sandoz's dispute regarding "a behavior inhibiting dose of guanfacine" revolves around the term of "behavioral disinhibition." As discussed above, the crux of the claimed methods of the '290 patent is the treatment of

"disorders which have prominent symptoms of behavioral disinhibition." (Ex. A, '290 patent Abstract.)  The patentees did not to include Plaintiffs' new language anywhere in the claims or specification of the patent, instead using the term "behavioral disinhibition" throughout.  If "a behavior inhibiting dose of guanfacine" were to be limited to "an amount of guanfacine that improves self-control of behavior," some of the intended scope of the claims may be omitted.  For example, it is not clear whether some of the symptoms expressly listed in the specification of the '290 patent would be encompassed by this term under Plaintiffs' construction because there is no description or evidence that those terms are necessarily synonymous with lack of self-control (*e.g.*, agitation, wandering, inappropriate aggression, etc.).  (Ex. A, '290 patent 1:30-24.)  Accordingly, the Court should adopt Sandoz's proposed construction of "a behavior inhibiting dose of guanfacine."

### 4.    "without inducing excessive sedation"

Claim 1 of the '290 patent (and claims 2-6 by dependency) recites in its preamble "[a] method of treating a behavioral disinhibition in a primate ***without inducing excessive sedation***."  Claim 7 (and claims 8-12 by dependency) recites in its preamble "[a] method of inhibiting a disinhibitory behavior in a primate ***without inducing excessive sedation***."  The parties dispute the meaning of the italicized phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
| --- | --- |
| without inducing as much sedation as clonidine | without inducing sedation to an extent that impairs functioning |

Sandoz's construction is derived directly from the intrinsic evidence, *i.e.*, the specification and prosecution history of the '290 patent, whereas Plaintiffs' construction finds no support in the intrinsic record, but instead introduces a new concept ("sedation to an extent that impairs functioning"), which creates ambiguity (*e.g.*, at what point does "functioning" become "impaired"?) and is inconsistent with the intrinsic record.

In interpreting an asserted claim, the court first looks to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims and the specification, and the prosecution history of the patent. *Vitronics*, 90 F.3d at 1582. The Federal Circuit deems the specification to be the "best source for understanding a particular term," however, a court should also consider the prosecution history of the patents-in-suit. *Phillips*, 415 F.3d at 1315-17. Here, the intrinsic evidence clearly defines "without inducing excessive sedation" in the context of the '290 patent to mean less sedation than that caused by administration of clonidine.

Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history. *Hoechst Celanese Corp. v. B.P. Chemis. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning.") (citations omitted). In this case, the patentees used the term "without inducing excessive sedation" in the specification to mean without inducing as much sedation as clonidine. For example, the sedative effect of guanfacine is directly compared to that of clonidine in the Background of the Invention (2:5-58), the Description of the Preferred Embodiments (3:52 – 4:28), the Examples (Exs. 1, 2, 3 & 4) and the Drawings. More specifically, in the Background section, the patentees discussed the drawbacks of treating ADHD with clonidine, stating that "it also has significant adverse side effects, including hypotension, 'withdrawal' effects due to its short half life, and ***excessive sedation.***" (Ex. A, '290 patent at 2:14-16.) (emphasis added). The patentees went on to draw a direct comparison between the

12

sedative effects of guanfacine and clonidine:

> Guanfacine, another alpha-2 adrenergic agonist, is less sedating
> than clonidine in monkeys. (Arnsten, A.F.T. et al. (1988)).

(*Id.* at 2:29-31.)  Similarly, in the Description of the Preferred Embodiments, the patentees again

discussed the differences between clonidine and guanfacine, specifically with regard to sedation:

> More particularly, higher doses of guanfacine improve behavior in
> hyperactive, inattentive, and impulsive young monkeys without the
> concomitant sedation associated with clonidine treatment.

(*Id.* at 4:19-22.)  More direct comparisons between clonidine and guanfacine appear in Examples

1-4, even providing quantitative assessments of sleepiness caused by the two drugs.  (*Id.* at 8:14-

63.)  Based on these comparative tests, the patentees concluded in Example 4 that "compared to

clonidine, guanfacine is less sedating and longer acting."  (*Id.* at 9:27-29.)  Tellingly, although

other prior art ADHD drugs are mentioned in the Background section of the '290 patent, no

comparisons to other prior art drugs are treated as a benchmark for sedation in the way that

clonidine is.

Finally, the specification of the '290 patent also reveals that Plaintiffs' selection of

"impairs functioning" in their construction is not synonymous with avoidance of excessive

sedation because "excessive sedation" and "impaired in functioning" are used in the same

sentence in a way that demonstrates that the patentees treated them as distinct, while again

directly comparing sedation levels between clonidine and guanfacine:

> However, patients ***were neither sedated nor impaired in
> functioning***, and did not show significant increases in sleepiness
> (0.38+/-0.31 off drug, 0.62=/-0.96 on guanfacine (mean +/- S.D.);
> p>0.4).  Interestingly, ten of the subjects (nine male, one female,
> age range three to eleven years) had previously been treated with
> clonidine, ***thus allowing direct comparison between the sedative
> effects of clonidine and guanfacine***.

(*Id.* at 8:45-52 (emphasis added).)

The '290 prosecution history before the PTO is a further source of intrinsic evidence for the purposes of claim construction and also clearly demonstrates that the patentees understood "excessive sedation" to mean in comparison to sedation caused by clonidine.  The patentee's statements to the PTO during prosecution are always relevant, and often determinative, of claim construction.  *Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.").  During prosecution of the '290 patent, in response to a rejection of the claims, the applicants characterized their alleged invention as follows, again comparing the sedative effect of clonidine with guanfacine:

> [t]he present invention features the use of guanfacine…for reduction of disinhibitory behaviors without inducing excessive sedation.  ***This method provides an alternative to using the nonselective alpha-2 agonist, clonidine, which causes sedation***.

('290 Prosec. Hist., Resp. to Office Action dated Sept. 2, 1997 at 3, attached hereto as <u>Exhibit H</u>) (emphasis added).  Thus, the patentees also made it clear during prosecution of the '290 patent that "excessive sedation" referred to the sedative effects of clonidine.

Ignoring the patentees' clear comparison to clonidine, Plaintiffs construe "without inducing excessive sedation" to mean "without inducing sedation to an extent that impairs functioning" without any further explanation regarding what it means to impair functioning.  The two most obvious flaws in Plaintiffs' proposed construction are (1) it is wholly unsupported by the intrinsic evidence, and (2) it fails to elucidate the meaning of this claim term, instead creating additional ambiguity regarding the scope of the claims, which is contrary to the purpose of the claim construction process.  Despite the fact that the intrinsic record clearly establishes that "excessive sedation," as used throughout the '290 patent, refers to one of the unwanted side

14

effects of clonidine, Plaintiffs inexplicably rely on extrinsic evidence in the form of randomly selected dictionary definitions. The definitions themselves are also problematic in that they offer no guidance regarding the practical meaning and scope of the term "excessive sedation." Thus, this term would require additional construction by this Court in order to make determinations regarding infringement and validity, which defeats the purpose of construing the claim at all. *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary explain what the patentee covered by the claims"). Therefore, the Court should not adopt Plaintiffs' construction because it fails to define the scope of this term and is unsupported by the case law and the facts of this case.

According to Federal Circuit precedent, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Sandoz's proposed construction of "without inducing excessive sedation" stays true to the claim language and most naturally aligns with the '290 patent's description of the alleged invention, and therefore is the correct construction.

### 5.   "readministering a dose at an interval required to obtain a desired level and duration of behavioral inhibition"

Claims 2 and 8 of the '290 patent recite the step of "readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition." The parties dispute the meaning of this phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| administering an amount of guanfacine multiple times within a single day or on multiple days to obtain a degree and length of time of improvement of ***behavioral disinhibition*** | administering an amount of guanfacine multiple times within a single day or multiple days to obtain a desired degree and length of time of improvement of ***self-control of behavior*** |

Once again, Plaintiffs' and Defendant's proposed constructions differ only in that Plaintiffs seek to substitute their new phrase "lack of self-control of behavior" for the patentees' phrase and the claim language "behavioral disinhibition," whereas Sandoz maintains the language chosen by the patentees in its proposed construction.  As discussed above, Plaintiffs provide no legitimate basis for substituting their phrase "lack of self-control of behavior" for the patentees' phrase that appears in the claims and throughout the specification of the '290 patent, "behavioral disinhibition/disinhibitory behavior."  The Court should adopt Sandoz's proposed construction, as it is derived from the patent itself and avoids the unnecessary confusion and ambiguity introduced by Plaintiffs' arbitrary selection of an unsupported definition for this claim term.

## B.    Disputed Claim Terms in the '599 and '794 Patents

The parties dispute the meaning of certain phrases and terms recited in the claims of the '599 patent and the '794 patent.  The '794 patent issued from an application filed exactly one year after the filing of the application which issued as the '599 patent, and the two patents are identical in many, but not all, respects.  Certain terms and phrases recited in the claims of the '599 patent are also recited in the '794 patent, and the parties agree that these common terms and phrases should be construed in the same way.  The following table compares claim 1 of the '599 patent with claim 3 of the '794 patent to illustrate the common recitation of terms in dispute in this case.

| '599 Patent Claim 1 | '794 Patent Claim 3 |
|---|---|
| 1. A pharmaceutical composition, comprising:<br><br>(a) at least one **pharmaceutically active agent that is pH dependent**;<br><br>(b) at least one **non-pH dependent sustained release agent**; and<br><br>(c) at least one **pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5**. | 3. A method for treating an attention deficit disorder or attention deficit with hyperactivity disorder in a patient, comprising administering to said patient a composition comprising (a) at least one **pharmaceutically active agent that is pH dependent**, said pharmaceutically active agent being guanfacine or guanfacine hydrochloride; (b) at least **non-pH dependent sustained release agent** selected from the group consisting of [a recited list of materials]; and (c) at least one **pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from a tablet dosage form at a pH in excess of 5.5**;<br><br>which is given in an amount effective to treat said attention deficit disorder or attention deficit with hyperactivity disorder in said patient. |

### 1.   "pharmaceutically active agent that is pH dependent"

As discussed above in Part II.B, the '599 and '794 patents are directed to compositions that have a common formulation with at least three basic components.  The first component—which is recited expressly or by dependency in *all* asserted claims—is a "pharmaceutically active agent that is pH dependent."[2]  The parties dispute the meaning of this phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| a molecule that provides activity in the body and that has pH-dependent aqueous solubility | No construction needed – plain and ordinary meaning |

Plaintiffs propose that no construction is necessary, and are unwilling to agree to Sandoz's proposed construction.  This is problematic because the claim language does not

---

[2] Claim 1 of the '599 patent (and claims 2-30 by dependency) and claims 3 and 8 of the '794 patent (and claims 4-7 and 9-12 by dependency) include this phrase.

specify the "pH-dependent" property of the active agent.  Based solely on the claim language, it isn't clear whether "pH-dependent" in the claim refers to pH-dependent solubility, pH-dependent absorption, pH-dependent biological activity, or some other unspecified pH-dependent property. Clearly, some construction is needed, and the '599 and '794 patent specifications provide all the information necessary to determine what the patentees intended by this phrase.

Sandoz's proposed construction relies on the specifications of the '599 and '794 patents, which make clear that the "pH-dependent" property of the claimed active agent refers to pH-dependent *solubility* in an aqueous environment.  Sandoz's proposed construction is consistent with the way the patentees used the phrase throughout the specification:

- "In particular, such compositions include at least one pharmaceutically active agent that has a ***pH dependent solubility profile*** . . ." (Exs. B & C, '599 & '794 patents 1:8-10);

- "The active agent(s) has (have) a ***solubility profile*** wherein the active agen(s) is (are) ***more soluble in an acidic medium than in a basic medium.***" (*id.* at 1:14-16);

- "The rate at which a drug goes into solution when it is dissolved in a medium is proportional to the ***solubility of the drug*** in the medium.  Many drugs have ***different solubilities at different pHs***.  These ***pH-dependent solubility differences*** lead to pH-dependent dissolution profiles." (*id.* at 1:17-21); and

- "Pharmaceutically active agents which are pH dependent and which may be included in the composition include, but are not limited to, weakly basic drugs and their salts that have ***higher solubilities at lower pH levels.***" (*id.* at 1:40-43).

The patentees could not have been more clear that their alleged invention is directed to compositions in which the active agent has pH-dependent *solubility*.  Thus, the patentees' own words make clear that a "pharmaceutically active agent that is pH dependent" as recited in the claims of the '599 and '794 patents is an agent with activity in the body and which exhibits pH-

dependent aqueous solubility.    Accordingly, the Court should adopt Sandoz's proposed construction.[3]

### 2.    "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5"

Another component of the common formulation of the compositions claimed by the '599 and '794 patents—which is also recited expressly or by dependency in *all* asserted claims—is a "pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from a tablet dosage form at a pH in excess of 5.5."[4]   The parties dispute the meaning of this phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| a substance that increases the rate of release of a pharmaceutically active agent from a composition in surrounding media having a pH above 5.5 | agent that increases the rate of release of the pharmaceutically active agent from a tablet in an environment that has a pH above 5.5 relative to an environment that has a pH of 5.5 or below |

There is one meaningful difference between the parties' proposed constructions. Plaintiffs seek to add a claim requirement that drug release is greater at pH above 5.5 compared to drug release at pH 5.5 or below in the presence of the recited "pH dependent agent." But neither the claim language, nor the patent specification, identifies the recited "pH dependent agent" by the rate of drug release at pH 5.5 or below. Plaintiffs' proposed construction would eliminate each of the embodiments described in the patent specification and is contrary to the purpose of the alleged invention as described by the patentees. The proper comparison is not

---

[3] Sandoz's proposed construction also includes the language "a molecule that provides activity in the body" which merely is intended to convey that the "pharmaceutically active agent" is a molecule with pharmaceutical activity, *i.e..*, activity in the body.

[4] Claim 1 of the '599 patent (and claims 2-30 by dependency) and claims 3 and 8 of the '794 patent (and claims 4-7 and 9-12 by dependency) include this phrase.

between drug release rates at pH above and below pH 5.5.  The proper comparison is done at "pH in excess of 5.5," as recited in the claim, and is between a composition with and without the recited "pH dependent agent."

At very low pH (*e.g.*, in the stomach at pH 1-2), an active ingredient such as guanfacine has much greater solubility than at pH in excess of 5.5 (*e.g.*, in the intestines).  (Ex. B, '599 patent Fig. 1.)  Drug release is affected by drug solubility, and may be greater at pH below 5.5 than at pH in excess of 5.5 for solubility reasons alone.  (Exs. B & C, '599 & '794 patents 1:17-23, 40-43.)  In order to know whether an agent increases the rate of drug release, the drug must have the same solubility in the compositions being compared, and thus the comparison must be done at the same pH.

Indeed, the very object of the alleged invention described in the '599 and '794 patents is to provide a composition "having a pH independent or minimized pH dependent dissolution profile."  (*Id.* at 1:6-8, 28-30.)  If the presence of the recited "pH dependent agent" caused faster drug release at pH in excess of 5.5 than at pH 5.5 or below, as Plaintiffs propose, then the composition would not function for its intended purpose.

The dissolution data provided in the patent specification demonstrate that Plaintiffs' multi-pH proposed construction cannot be correct.  The data in the patent specification demonstrate that dissolution/drug release for compositions of the alleged invention are not greater at pH in excess of 5.5 than at pH 5.5 or below.  (*Id.* at Table 2.)  For example, compare dissolution at pH 1.1 (the red columns in the table below) with dissolution at pH 6.8 (the blue columns in the table below) for each of the Formulations of the alleged invention (PD0052-28B, PD0052-32B, PD0052-32D and PD0052-39A):

**TABLE 2**

Dissolution Data for Guanfacine Sustained Release Tablets

| Time | PD0052-22A | | PD0052-25B | | PD0052-28B | | PD0052-32B | | PD0052-32D | | PD0052-39A | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (hour) | 1* | 2** | 1 | 2 | 1 | 2 | 1 | 2 | 1 | 2 | 1 | 2 |
| 0.5 | 14.0 ± 0.6 | 7.0 ± 1.2 | 13.0 ± 1.5 | 5.0 ± 0.6 | 8.4 ± 2.1 | 10.0 ± 0.6 | 19.0 ± 1.2 | 12.0 ± 0.0 | 31.0 ± 1.2 | 11.0 ± 1.0 | 14.0 ± 0.6 | 10.0 ± 1.0 |
| 1.0 | 24.0 ± 1.0 | 12.0 ± 1.0 | 27.0 ± 2.0 | 7.0 ± 1.0 | 41.0 ± 1.7 | 20.0 ± 1.0 | 31.0 ± 2.6 | 20.0 ± 0.6 | 48.0 ± 1.2 | 19.0 ± 0.6 | 25.0 ± 1.0 | 18.0 ± 2.0 |
| 2.0 | 44.0 ± 0.6 | 19.0 ± 1.5 | 48.0 ± 2.5 | 11.0 ± 0.6 | 64.0 ± 2.5 | 36.0 ± 2.5 | 50.0 ± 4.2 | 35.0 ± 0.6 | 80.0 ± 5.6 | 31.0 ± 1.2 | 42.0 ± 1.0 | 31.0 ± 4.0 |
| 3.0 | 59.0 ± 0.6 | 26.0 ± 1.5 | 63.0 ± 1.7 | 14.0 ± 0.6 | 77.0 ± 2.6 | 49.0 ± 3.6 | 65.0 ± 6.1 | 49.0 ± 1.0 | 96.0 ± 5.0 | 46.0 ± 0.6 | 56.0 ± 2.6 | 46.0 ± 4.4 |
| 4.0 | 71.0 ± 6.0 | 31.0 ± 2.9 | 74.0 ± 1.5 | 16.0 ± 0.6 | 86.0 ± 3.2 | 59.0 ± 3.2 | 77.0 ± 5.5 | 61.0 ± 1.0 | 104 ± 3.5 | 56.0 ± 0.6 | 69.0 ± 3.0 | 56.0 ± 5.8 |
| 6.0 | 90.0 ± 2.0 | 39.0 ± 2.5 | 86.0 ± 1.7 | 19.0 ± 0.0 | 97.0 ± 3.5 | 71.0 ± 5.0 | 99.0 ± 4.4 | 87.0 ± 2.5 | 111 ± 4.0 | 74.0 ± 1.2 | 90.0 ± 2.6 | 72.0 ± 6.2 |
| 8.0 | 99.0 ± 1.7 | 46.0 ± 2.5 | 93.0 ± 2.1 | 21.0 ± 1.0 | 108 ± 3.8 | 80.0 ± 5.5 | 102 ± 1.2 | 97.0 ± 1.5 | 112 ± 4.0 | 89.0 ± 2.3 | 102 ± 2.3 | 83.0 ± 6.4 |
| 12.00 | 105.0 ± 1.5 | 61.0 ± 4.7 | 100.0 ± 1.2 | 25.0 ± 1.0 | 113 ± 3.6 | 91.0 ± 6.0 | 103 ± 2.3 | 98.0 ± 1.0 | 113 ± 3.8 | 107 ± 2.9 | 112 ± 0.6 | 96.0 ± 4.2 |

*1 = percent dissolved using a pH 1.2 dissolution medium
**2 = percent dissolved using a pH 6.8 dissolution medium
Note:
The data represent the mean percent dissolved ± standard deviation of three replicate.

(Ex. C, '794 patent Table 2 (shading added).)   In each case, the dissolution percentage (drug release) at pH 1.1 (column "1") is greater than the dissolution (drug release) at pH 6.8 (column "2") at each measured time point.   Each of these formulations contains the recited pH dependent agent, but drug release is slower at pH in excess of 5.5 than it is at pH 5.5 or below—the very opposite of Plaintiffs' proposed construction.

Under Plaintiffs' proposed constructions, each of the Formulation examples described in Tables 2 in the specification would be excluded from the claim, since the presence of the "pH dependent agent" did not increase dissolution at pH above 5.5 compared to pH at or below 5.5. Plaintiffs' construction cannot be correct if it excludes every embodiment of the alleged invention described in the patent specification. *Vitronics*, 90 F.3d at 1583-84 (explaining that a claim construction that excludes every embodiment, including the preferred embodiment, "is rarely, if ever, correct and would require highly persuasive evidentiary support"). Accordingly, the Court should adopt Sandoz's proposed construction.

3.      **"polymer that swells at a pH in excess of 5.5"**

Claims 2, 9, and 28 of the '599 patent[5] and claims 4, 5, 9, and 10 of the '794 patent recite that the "at least one pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5" (*see* Part III.B.2) may be a "*polymer that swells at a pH in excess of 5.5*." The parties dispute the meaning of the italicized phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| a molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in surrounding media having a pH above 5.5 | a molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below |

The principal difference between the parties' proposed constructions is the same as that discussed above in Part III.B.2. Plaintiffs seek to add a claim requirement that swelling (or expansion) is greater at pH above 5.5 as compared to pH 5.5 or below. However, neither the claim language, nor the patent specification, defines the recited "polymer that swells at a pH in excess of 5.5" with reference to what it does at pH 5.5 or below. The plain meaning of the phrase is that a polymer that swells at a pH above 5.5 meets this claim limitation, regardless of whether it swells, shrivels, or remains static at a pH of 5.5 or below. There is no comparison to an environment of pH at or below 5.5 inherent in or suggested by the diction of the claim language or the specification. In short, what a polymer does at pH 5.5 or below is irrelevant to whether it meets the claim limitation of "swells at a pH in excess of 5.5." Adding the unsupported requirement Plaintiffs propose in their construction risks erroneously including or

---

[5] Plaintiffs have not asserted claims 2, 9, and 28 of the '599 patent against Sandoz.

excluding a potential polymer based on its activity in an environment that is not discussed and was not intended.  Accordingly, the Court should adopt Sandoz's proposed construction.

### 4. "agent that increases the solubility of at least one pharmaceutically active agent at a pH of greater than 5.5"

Claim 4 of the '599 patent (and claims 11, 12, and 14 by dependency) recites that at least one pH dependent agent recited in claim 1 is an "agent that increases the solubility of said at least one pharmaceutically active agent at a pH of greater than 5.5."  The parties dispute the meaning of this phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| a substance that increases the amount of a pharmaceutically active agent that will dissolve when the surrounding media has a pH above 5.5 | agent that increases the amount of the pharmaceutically active agent that will dissolve in a given amount of another substance in an environment which has a pH above 5.5 relative to an environment which has a pH of 5.5 or below |

The parties' dispute is the same as that briefed above for other terms involving properties of materials at pH in excess of 5.5.  (*See* Parts III.B.2 & III.B.3.)  Plaintiffs' proposed construction adds a requirement that a comparison is made between compositions at a pH above and below 5.5.  That construction excludes every formulation of the alleged invention described in the patent specification, and is contrary to the very purpose of the alleged invention, *i.e.*, to provide pH-independent release.  Thus, the Court should adopt Sandoz's proposed construction.

### 5. "agent that maintains an acidic microenvironment in the composition"

Claim 13 of the '599 patent recites that the "at least one pH dependent agent that increases the rate of release of said at least one pharmaceutically active agent from the tablet at a pH in excess of 5.5" (*see* Part III.B.2) may be an "***agent that maintains an acidic***

*microenvironment in the composition.*"[6]   The parties dispute the meaning of the italicized

phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|
| a substance that imparts a greater acidic character in the regions immediately around or in close proximity to a pharmaceutically active substance than that of the surrounding media | agent that imparts an acidic character to the regions immediately around or in close proximity to the pharmaceutically active agent in the composition |

The parties agree that "microenvironment in the composition" refers to the "regions

immediately around or in close proximity to" a pharmaceutically active substance (*e.g.*, the

claimed pH-dependent pharmaceutically active agent).   However, the parties disagree about

whether the recitation of "an acidic microenvironment" requires an inherent comparison to the

macroenvironment of the surrounding media or composition.   Plaintiffs' proposed construction

does not address this question and deliberately provides no context for construing the claim

language.   *Tivo, Inc. v. Echostar Comms. Corp.*, No. 2:04-cv-1, 2005 U.S. Dist. LEXIS 46879, at

*19-20 (E.D. Tex. Aug. 18, 2005) (declining to adopt construction that did not clarify the

meaning of the claim term and only added ambiguity because a term used in the construction was

in need of further construction).   However, the specification is clear that the concept of an acidic

microenvironment only makes sense relative to the macroenvironment of the surrounding media.

The claim construction should recognize this.   *U.S. Surgical Corp.*, 103 F.3d at 1568 (claim

construction is intended "to clarify and . . . explain what the patentee covered by the claims").

---

[6] Due to a printing error that was never corrected, claim 13 does not expressly depend from another claim, but reads as—and to be valid must be—a dependent claim that depends, directly or indirectly, from the sole independent claim 1.   The prosecution history indicates that when claim 13 was added to the application for the '599 patent by amendment, it depended directly from claim 1.   ('599 Patent Prosec. Hist., Amend. of June 11, 2001 at 2, attached hereto as Exhibit I.)

As discussed above in Parts II.B and III.B.2, the formulations discussed in the '599 and '794 patents all include, as one of three basic components, a "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5." The patents state that this component may be, among other things, an agent that increases solubility by maintaining an acidic microenvironment in a tablet containing the composition, such as, *e.g.*, an organic acid.  (Exs. B & C, '599 & '794 patents 2:8-15, 28-34.)  The patents do not discuss the "acidic microenvironment" concept in detail, but every mention of the acidic microenvironment in the patents uniformly includes a reference to the relative macroenvironment of the "tablet" that forms the matrix for all components of the claimed formulations.  (*See, e.g., id.* at 2:38-39 ("at least one organic acid that maintains an acidic micro-environment *in the tablet*"); 2:14-15 ("maintaining an acidic microenvironment *in the tablet*"); 2:30-31 ("organic acids maintain an acidic microenvironment *in the tablet*").   Indeed, the definition of a "microenvironment" as the "regions immediately around or in close proximity to" an object relies on the contrast with the larger space the object occupies.  Were this contrast not inherent and intended by the patentees, there would be no need to describe a "micro" environment and, instead, the patents would simply describe and claim an "acidic []environment."

Because this contrast was intended in the claim language, as shown by the specification, the Court should adopt Sandoz's proposed construction of an "agent that maintains an acidic microenvironment in the composition" as "a substance that imparts a greater acidic character in the regions immediately around or in close proximity to a pharmaceutically active substance than that of the surrounding media."

6.     "about"

Claims 18-23 of the '599 patent recite specific weight percentage ranges for the pharmaceutically active agent in the formulation claimed in claim 1.  Each of the recited ranges includes endpoints made ambiguous by the term "about."  The meaning of the term "about" is not straightforward and subject to interpretation because it does not have a universal meaning in patent claims, but instead depends on the context of the invention of the particular case.  *See Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995).  Neither the specification, nor the prosecution history of the '599 patent provide any express definition of the scope of "about" with regard to the recited ranges.  However, based on the data and ranges recited in the specification, a person having ordinary skill in the art would understand that "about" is recited in claims 18-23 of the '599 patent to allow for standard measuring errors by applying basic rounding concepts based on the number of significant figures in the measurement. (*See* Harvey, D., Modern Analytical Chemistry, ch. 2, at 13-15 (McGraw Hill 1996) [SAN-GUAN-0004973-4998], attached hereto as <u>Exhibit I</u>.)  Thus, Sandoz asserts that "about" should be construed to allow for the following margins of measuring error:

| Claim No. | Claim language | Sandoz's Proposed Construction |
|---|---|---|
| 18 | said pharmaceutically active agent is present in the composition in an amount of from about 0.1 wt. % to about 70 wt. % | plain meaning, *i.e.*, the pharmaceutically active agent is present in the composition in an amount of from 0.05 wt. % to 75 wt. % |
| 19 | said pharmaceutically active agent is present in the composition in an amount of from about 1 wt. % to about 40 wt. % | plain meaning, *i.e.*, the pharmaceutically active agent is present in the composition in an amount of from 0.5 wt. % to 45 wt. % |
| 20 | said non-pH dependent sustained release agent is present in the composition in an amount of from about 5 wt. % to about 50 wt. % | plain meaning, *i.e.*, the non-pH dependent sustained release agent is present in the composition in an amount of from 4.5 wt. % to 55 wt. % |

| 21 | said non-pH dependent sustained release agent is present in the composition in an amount of from about 10 wt. % to about 30 wt. % | plain meaning, *i.e.*, the non-pH dependent sustained release agent is present in the composition in an amount of from 5 wt. % to 35 wt. % |
| --- | --- | --- |
| 22 | said at least one pH dependent agent is present in the composition in an amount of from about 0.5 wt. % to about 40 wt. % | plain meaning, *i.e.*, at least one pH-dependent agent is present in the composition in an amount of from 0.45 wt. % to 45 wt. % |
| 23 | said at least one pH dependent agent is present in the composition in an amount of from about 1 wt. % to about 20 wt. % | plain meaning, *i.e.*, at least one pH-dependent agent is present in the composition in an amount of from 0.5 wt. % to 24 wt. % |

Plaintiffs' proposed construction of "about," as recited in claims 18-23 of the '599 patent, is "approximately," but Plaintiffs do not include any numeric component to define the scope of the terms.  As discussed above, the purpose of claim construction is to reduce the ambiguity and risk of confusion by defining the scope of claim terms.  *See U.S. Surgical Corp.*, 103 F.3d at 1568.  Here, Plaintiffs merely substitute one ambiguous claim term ("about") for another ("approximately") without providing any clarification as to the scope of the recited ranges.  In contrast, Sandoz's proposed constructions provide typical ranges allowing for experimental or measuring error associated with the recited ranges.  Thus, the Court should adopt Sandoz's proposed constructions of the claim terms containing the word "about" because they will aid the Court in later making determinations of infringement and validity, whereas Plaintiffs' proposed constructions will once again leave the claims ambiguous and in need of further construction at later stages in this litigation to determine what "approximately" means.

### 7.        "reducing the likelihood of side effects associated with the administration of guanfacine"

Claim 8 of the '794 patent (and claims 9-12 by dependency) recites in its preamble "[a] method of ***reducing the likelihood of side effects associated with the administration of guanfacine***."  The parties dispute the meaning of the italicized phrase and propose the following constructions:

| Sandoz's Proposed Construction | Plaintiffs' Proposed Construction |
| --- | --- |
| decreasing the incidence or severity of side effects compared to administering the same amount of guanfacine as an immediate release composition | reducing the probability of side effects resulting from guanfacine administration |

The parties' dispute centers on the point of reference by which the claimed "reduction" is measured—*i.e.*, the claimed composition reduces the likelihood of side effects associated with the administration of guanfacine *as compared to what*?  Plaintiffs' proposed construction does not address this question and deliberately provides no context for construing the claim language. *Tivo*, 2005 U.S. Dist. LEXIS 46879, at *19-20 (declining to adopt construction that did not clarify the meaning of the claim term and only added ambiguity because a term used in the construction was in need of further construction).  However, the specification is clear that the point of reference by which the claimed reduction is compared is an *immediate release composition*.  The claim construction should recognize and honor this comparison.  *U.S. Surgical Corp.*, 103 F.3d at 1568 (claim construction is intended "to clarify and . . . explain what the patentee covered by the claims").

The only disclosure in the '794 patent relating to a reduction of the likelihood of side effects is in Example 5 of the specification.  Example 5 discusses the results of studies comparing extended release tablet formulations of the pH-dependent active ingredient anagrelide hydrochloride (*i.e.*, Formulations 1, 2, and 3) with immediate release tablet formulations of the same API (*i.e.*, AGRYLIN®).[7]  (Ex. C, '794 patent 11:61-67.)  Example 5 includes a discussion of the adverse events that were reported by study subjects taking both the immediate release and extended release formulations.  (*Id.* at 13:17 – 14:40.)  Specifically, the specification states "[t]he

---

[7] Notably, there is no disclosure in the '794 patent regarding the reduction of side effects relating to any *guanfacine* composition.

incidence of subjects reporting adverse events for the new extended-release formulations . . . were substantially lower than the incidence observed in the Agrylin® group." (*Id.* at 13:61-65.) Further, Example 5 discusses both the incidence (*e.g.*, Tables 9 & 10) and severity (*e.g.*, 14:33-40) of adverse events.

Because Example 5 is the only specific disclosure in the '794 patent regarding the reduction of the likelihood of side effects of any formulation, and because the example discusses the incidence **and** severity of side effects in the studies discussed, the phrase "reducing the likelihood of side effects associated with the administration of guanfacine" should be construed as "decreasing the incidence or severity of side effects compared to administering the same amount of guanfacine as an immediate release composition."   Accordingly, the Court should adopt Sandoz's proposed construction.

## V.    CONCLUSION

Based on the reasons given herein, and any further reasons presented to the Court in further briefing or during any claim construction hearing, Defendant Sandoz respectfully requests that the Court adopt Sandoz's proposed constructions of the disputed claim terms.

Dated:  February 3, 2012                    Respectfully submitted,

                                            *Original signature on file at Duane Morris LLP*

                                            s/Richard T. Ruzich
                                            Edward C. Stewart
                                            Wheeler Trigg O'Donnell LLP
                                            1801 California Street, Suite 3600
                                            Denver, Colorado 80202
                                            Telephone:  303.244.1800
                                            Facsimile:  303.244.1879
                                            E-mail:    stewart@wtotrial.com

                                            and

Richard T. Ruzich
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603-3433
Telephone:  312.499.6783
Facsimile:  312.896.5652
Email:      rtruzich@duanemorris.com

Vincent L. Capuano
Laura A. Vogel
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA  02110
Telephone:  857-488-4284
Facsimile:  857-401-3045
Email:  vcapuano@duanemorris.com
         lavogel@duanemorris.com

*Attorneys for Defendant Sandoz Inc.*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on February 3, 2012, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following email addresses:

- **Thomas Clay Bell**
  tom.bell@dgslaw.com, bernadette.marquez@dgslaw.com
- **Richard Thomas Ruzich**
  rtruzich@duanemorris.com, paskinner@duanemorris.com, blkann@duanemorris.com

s/Richard T. Ruzich
Richard T. Ruzich
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603-3433
Telephone:  312.499.6783
Facsimile:  312.896.5652
Email:       rtruzich@duanemorris.com

*Attorneys for Defendant Sandoz Inc.*