IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:11-cv-01110-RBJ-KMT

SHIRE LLC,
SUPERNUS PHARMACEUTICALS, INC.,
SHIRE DEVELOPMENT INC.,
SHIRE INTERNATIONAL LICENSING BV,
AMY F.T. ARNSTEN, PH.D.,
PASKO RAKIC, M.D., and
ROBERT D. HUNT, M.D.,

       Plaintiffs,

v.

SANDOZ INC.,

       Defendant.

---

## SANDOZ INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... ii

I.   INTRODUCTION ................................................................................................................. 1

II.  ARGUMENT ......................................................................................................................... 1

     A.   Disputed Claim Terms in the '290 Patent ................................................................. 1

          1.   "readministering the dose at an interval required to obtain a
               desired level and duration of behavioral inhibition" .................................... 1

          2.   "treating a behavioral disinhibition" ............................................................. 3

          3.   "inhibiting a disinhibitory behavior" ............................................................. 3

          4.   "a behavior inhibiting dose of guanfacine" .................................................. 4

          5.   "without inducing excessive sedation" ......................................................... 4

          6.   "readministering a dose at an interval required to obtain a
               desired level and duration of behavioral inhibition" .................................... 8

     B.   Disputed Claim Terms in the '599 and '794 Patents .............................................. 9

          1.   "pharmaceutically active agent that is pH dependent" ................................. 9

          2.   "pH dependent agent that increases the rate of release of
               said pharmaceutically active agent from the tablet at a pH
               in excess of 5.5" ......................................................................................... 10

          3.   "polymer that swells at a pH in excess of 5.5" ........................................... 13

          4.   "agent that increases the solubility of at least one
               pharmaceutically active agent at a pH of greater than 5.5" ....................... 14

          5.   "agent that maintains an acidic microenvironment in the
               composition" ............................................................................................... 15

          6.   "about" ......................................................................................................... 16

          7.   "reducing the likelihood of side effects associated with the
               administration of guanfacine" .................................................................... 18

III. CONCLUSION ................................................................................................................... 19

## I.     INTRODUCTION

In their Opening Brief on Claim Construction (Doc. No. 89), Plaintiffs fail to provide persuasive justifications for their proposed constructions.  Plaintiffs often ignore the patents' specifications and, in some instances, rely on extrinsic evidence that is not consistent with the specifications.   Some of Plaintiffs' proposed constructions introduce ambiguity rather than clarity in interpreting the claim language.   Finally, many of Plaintiffs' constructions are inconsistent with constructions they proposed or agreed to in related litigation involving the same patents in Shire LLC v. Impax Labs., Inc., N.D. Cal. No. 10-cv-05467 ("Northern District of California Litigation").   For these reasons, and for the reasons provided in Sandoz's Opening Claim Construction Brief (Doc. No. 90), the Court should adopt Sandoz's proposed constructions of the disputed claim terms.

## II.    ARGUMENT

### A.     Disputed Claim Terms in the '290 Patent

#### 1.     "readministering the dose at an interval required to obtain a desired level and duration of behavioral inhibition"

The sole dispute between the parties with respect to this claim phrase relates to the term "behavioral inhibition."   Plaintiffs assert that this term should be construed to mean administering an amount of guanfacine to obtain a desired degree of "improvement of self-control of behavior," while Sandoz understands this term to mean administering an amount of guanfacine to obtain a desired degree of "improvement of behavioral disinhibition."  Plaintiffs' proposed construction is unsupported by the intrinsic evidence, and Plaintiffs cite no other support for their proposed construction. (*See* Shire Opening Br. at 20-21.)

The primary problem with Plaintiffs' proposed construction of "behavioral disinhibition" is that "lack of self-control" is a subset of the broader concept of "behavioral disinhibition," as

that term is used by the inventors throughout the '290 patent.  Plaintiffs' incorrectly narrow construction is the result of their failure to properly rely on the intrinsic evidence, *i.e.*, the specification.

It is undisputed that the specification of a patent is always relevant to the claim construction analysis and is usually the single best guide to the meaning of a disputed claim term.  *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357 (Fed. Cir. 2006) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)).  Despite the fact that specification of the '290 patent provides a detailed discussion of the types of "behavioral disinhibition" to be treated with the claimed methods, Plaintiffs propose a construction that finds no direct support in the specification.  For example, Plaintiffs cite to two sections of the specification, seemingly because they include the words "uncontrolled" or "control," but fail to acknowledge that the term "self-control" does not appear ***anywhere*** in the specification of the '290 patent.  (Shire Opening Br. at 21 (citing '290 patent 3:7-11, 43-45).)

There is no express definition of "behavioral disinhibition" in the '290 patent.  Instead, the specification explains that some diseases have prominent symptoms of disinhibitory behavior, such as Attention-Deficit Hyperactivity Disorder, Conduct Disorder, Oppositional Defiant Disorder, Tourette's Syndrome, Lesch-Nyhan Syndrome, Post-Traumatic Stress Disorder or dementia, and goes on to provide examples of such symptoms, including but not limited to:  "agitation, hyperactivity, distractibility, inattention, impulsivity, disorganization, uncontrolled aggression, self-mutilation, and uncontrolled movements."  ('290 patent (Doc. No. 90-2) 2:66-3:11.)  Clearly the inventors intended to include more than lack of self-control when they chose the term "behavioral disinhibition."  Limiting "behavioral disinhibition" to "lack of

self-control of behavior" (and variations thereof) potentially excludes symptoms that were intended to be included by the patentees' selection of the term "behavioral disinhibition."

Another problem arising from the lack of intrinsic support for Plaintiffs' construction is that it creates the potential for confusion and ambiguity in defining the true scope of the asserted claims by importing new terminology, which is contrary to the fundamental goal of the claim construction process. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (explaining that "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims"). Thus, this Court should adopt Sandoz's construction because Plaintiffs' construction creates confusion and ambiguity as to claim scope and also contradicts the patentees' own description of the intended scope of the claimed invention.

### 2.       "treating a behavioral disinhibition"

The parties' proposed constructions of "treating a behavioral disinhibition" are almost identical. The only difference in the two proposed constructions is that Sandoz's proposed construction includes the patentees' wording as used in the specification and claims— "behavioral disinhibition"—while Plaintiffs' proposed construction replaces the patentees' language with the phrase "lack of self-control of behavior," which is unsupported by the specification of the '290 patent. For at least the reasons discussed above in Part II.A.1, the Court should adopt Sandoz's proposed construction.

### 3.       "inhibiting a disinhibitory behavior"

Once again, Plaintiffs' and Defendant's proposed constructions differ only in that Plaintiffs seek to substitute "lack of self-control of behavior" for the claim term "behavioral disinhibition," whereas Sandoz maintains the language chosen by the patentees in its proposed construction. As discussed above in Part II.A.1, Plaintiffs provide no legitimate basis for

substituting their new phrase "lack of self-control of behavior" for the term that appears in the claims and that was used by the patentees throughout the specification of the '290 patent, "behavioral disinhibition/disinhibitory behavior."  The Court should adopt Sandoz's proposed construction, as it derives from the patent itself and avoids the unnecessary confusion and ambiguity introduced by Plaintiffs' arbitrary selection of an unsupported new definition for this claim term.

### 4.    "a behavior inhibiting dose of guanfacine"

As with the terms above, Plaintiffs' and Sandoz's dispute regarding "a behavior inhibiting dose of guanfacine" revolves around the term of "behavioral disinhibition."  As discussed above, the crux of the claimed methods of the '290 patent is the treatment of "disorders which have prominent symptoms of behavioral disinhibition." ('290 patent Abstract.) The patentees did not include Plaintiffs' new language anywhere in the claims or specification of the patent itself, but instead used the term "behavioral disinhibition" throughout the patent.  If "a behavior inhibiting dose of guanfacine" were to be limited to "an amount of guanfacine that improves self-control of behavior," some of the intended scope of the claims may be omitted. For example, it is not clear whether some of the symptoms expressly listed in the specification of the '290 patent would be encompassed by this term under Plaintiffs' construction because there is no description or evidence that those terms are necessarily synonymous with lack of self-control (*e.g.*, agitation, wandering, inappropriate aggression, etc.).   ('290 patent 1:30-24.) Accordingly, the Court should adopt Sandoz's proposed construction of "a behavior inhibiting dose of guanfacine."

### 5.    "without inducing excessive sedation"

The disputed aspect of this claim phrase is the measure by which one determines whether sedation is "excessive."  Sandoz's proposed construction—"without inducing as much sedation

as clonidine"—is based on intrinsic evidence (*i.e.*, the specification).   However, Plaintiffs' proposed construction of this phrase to mean "without inducing sedation to an extent that impairs functioning" is primarily based on extrinsic evidence.   Plaintiffs' construction is flawed because (a) they ignored controlling Federal Circuit precedent when they considered extrinsic evidence before intrinsic evidence, (b) the extrinsic evidence relied upon by Plaintiffs does not support their proposed construction, and (c) the specification does not support this construction.

Plaintiffs improperly rely on extrinsic evidence in the form of a dictionary definition as the premise for their proposed construction.   (*See* Shire Opening Br. at 16-17 (citing Oxford Encyclopedic English Dictionary).)   As Plaintiffs concede, a court should not resort to extrinsic evidence where the specification of the patent is clear and unambiguous as to the meaning of a disputed term.   (Shire Opening Br. at 13 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996))); *see also Phillips*, 415 F.3d at 1321 ("The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent.").   As explained further below, the specification of the '290 patent and its prosecution history establish that the claim phrase "without inducing excessive sedation" means "without inducing as much sedation as clonidine."   Accordingly, Plaintiffs err in proposing a construction that ignores the specification and prosecution history in favor of extrinsic evidence.

There is also a disconnect between the dictionary definition relied upon by Plaintiffs and their proposed construction.   Specifically, the general dictionary definition of "excessive" cited by Plaintiffs is "too much or too great" or "more than what is normal or necessary." (Shire Opening Br. at 16-17 (citing Oxford Encyclopedic English Dictionary).)   But Plaintiffs do not

explain how they jump from this definition to construe "excessive" sedation to mean "sedation to an extent that impairs functioning."

Looking beyond this inconsistency, another problem with this proposed construction is the fact that relying on this general dictionary definition introduces ambiguity into the claim language, which is contrary to the objective of the claim construction process. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Not only do Plaintiffs not provide a measure by which to distinguish "sedation" from "excessive sedation," they do not explain or define "impaired functioning." There is no support in the specification for Plaintiffs' vague assertions that interference with "academic performance and other activities" is the definition of "impaired functioning" or "excessive sedation." (Shire Opening Br. at 17-18.)

When Plaintiffs finally turn to the specification, they ignore or mischaracterize most of the context requiring a comparison with clonidine. While Plaintiffs admit that the '290 patent expressly states that one significant adverse side effect associated with the administration of the prior art ADHD drug clonidine is "excessive sedation," they attempt to downplay this disclosure by labeling it a "particular example" of a drug that causes excessive sedation. (Shire Opening Br. at 17-18). They even go so far as to state that "nowhere in the patent is it stated that clonidine is the *only* drug against which guanfacine's clinical effects are to be judged," but this statement is misleading in that clonidine is the *only drug against which guanfacine's clinical effects are judged in the '290 patent*. (Shire Opening Br. at 18 (emphasis in original).)

Indeed, nearly every discussion in the specification of the sedation, or lack of sedation, associated with guanfacine references the sedation associated with clonidine. (*See* '290 patent 2:15-18, 29-50; 3:58-59; 4:19-22; 6:41-42, 56-60; 7:7-10, 29-36; 8:1-2, 45-53, 55-59; 9:27-28 & Fig. 2B.) For example, the side effects of guanfacine and clonidine are directly compared in

Example 3, "The Effect of Administering Guanfacine v. Clonidine to Aged Monkeys." (*Id.* at 7:46 – 8:6.)  Plaintiffs assert that the two drugs "were not assessed against one another" in the Monkey Studies because side effects were rated based on two ratings scales.  (Shire Opening Br. at 18.)  But, Plaintiffs do not address the direct clonidine/guanfacine comparison described in Example 3, in which the patentees did not apply objective comparative scales because "these data were collected prior to the development of the agitation/sedation rating scales.  ('290 patent 7:46 – 8:6.)

To broaden the scope of possible drugs to compare with guanfacine, Plaintiffs generally refer to "medicines that cause sedation" when discussing prior art ADHD drugs.  (Shire Opening Br. at 17.)  However, no potential sedatives other than clonidine are discussed in the '290 patent.  In fact, the only other drug that is briefly mentioned is RITALIN[®], which is a stimulant with side effects such as insomnia, appetite suppression, irritability, etc. (*i.e.*, the opposite of sedation).  ('290 patent 1:49 – 2:4.)  When one considers the entire specification, it is clear that avoidance of "excessive sedation," as recited in the claims, is with reference to the excessive sedation associated with administration of clonidine.

Additionally, in equating sedation with impaired functioning, Plaintiffs misinterpret this key paragraph in the specification:

> However, patients ***were neither sedated nor impaired in functioning***, and did not show significant increases in sleepiness (0.38+/-0.31 off drug, 0.62+/-0.96 on guanfacine (mean+/-S.D.); p>0.4).  Interestingly, ten of the subjects (nine male, one female, age range three to eleven years) had previously been treated with clonidine, ***thus allowing direct comparison between the sedative effects of clonidine and guanfacine.***

('290 patent 8:45-52 (emphasis added).)  Far from supporting an equivalence between sedation and impaired functioning, this paragraph shows that sedation and impairment are treated as ***two independent characteristics***.  (Shire Opening Br. at 17.)  What Plaintiffs do not include in their

interpretation of the first sentence of this paragraph is an explanation for why the patentees would use the phrase "impaired in functioning" to convey "excessive sedation" in this paragraph, rather than simply repeating the term "excessive sedation," which the patentees used in an earlier discussion of clonidine side effects.  (*See* '290 patent 2:14-16.)  Unlike the term "sedation," which appears repeatedly throughout the specification, "impaired functioning" is used only in this single instance.  In short, excessive sedation and impaired functioning were not synonymous in the minds of the patentees.

Because Plaintiffs construction creates ambiguity (what is impaired functioning?) and is inconsistent with the specification, the Court should adopt Sandoz's proposed construction of "without inducing excessive sedation" to mean "without inducing as much sedation as clonidine".

> **6.** **"readministering a dose at an interval required to obtain a desired level and duration of behavioral inhibition"**

As with Parts II.A.1 - 4 above, Plaintiffs' and Defendant's proposed constructions differ only in that Plaintiffs seek to substitute the phrase "lack of self-control of behavior" for the patentees' claim language "behavioral disinhibition," whereas Sandoz maintains the language chosen by the patentees in its proposed construction.  As discussed above, Plaintiffs provide no legitimate basis for substituting their phrase "lack of self-control of behavior" for a phrase that appears in the claims and throughout the specification of the '290 patent, "behavioral disinhibition/disinhibitory behavior."  The Court should adopt Sandoz's construction because it derives from the patent itself and avoids the confusion and ambiguity introduced by Plaintiffs' arbitrary selection of an unsupported definition for this claim term.

**B.    Disputed Claim Terms in the '599 and '794 Patents**

**1.    "pharmaceutically active agent that is pH dependent"**

The parties' dispute regarding the construction of a "pharmaceutically active agent that is pH dependent" (a phrase that appears in *all* asserted claims) is how to construe "pH dependent." Plaintiffs argue that no construction of this phrase is needed because "the words adequately and precisely speak for themselves." (Shire Opening Br. at 39.) But, the claim language does not in any way—much less adequately and precisely—indicate what property of the pharmaceutically active agent is "pH dependent."

The answer is clear from reading the specifications of the '599 and '794 patents. (Doc. Nos. 90-3 & 90-4.) The pH dependent property to which the claim language refers is *aqueous solubility*. ('599 & '794 patents 1:8-10, 14-16, 17-21 & 40-43.) Plaintiffs acknowledge this themselves elsewhere in their brief. (Shire Opening Br. at 26 & n.34 ("*Solubility* is the amount of *the pharmaceutically active agent* that dissolves in a given volume of dissolution medium. For example, *to measure the impact of pH on the solubility* of anagrelide hydrochloride, the drug substance would be dissolved in multiple dissolution media having varying pH . . . .") (emphasis added).)

Plaintiffs' objection to Sandoz's construction is that "'[a]queous solubility' adds complexity to the claim in ways that are not called for by the plain words of the claim." (Shire Opening Br. at 39.) But, Plaintiffs do not even try to explain what complexity is implicated by this construction. Further, Plaintiffs' position is contrary to their own agreed construction of this phrase in the Northern District of California Litigation, where the parties agreed that a "pharmaceutically active agent that is pH dependent" means a "drug that has a different *solubility* at different pHs." (Shire LLC v. Impax Labs., Inc., N.D. Cal. No. 10-cv-05467, Doc. No. 143-4, at 6 (Feb. 21, 2012), attached hereto as <u>Exhibit 1</u> (emphasis added).)

In view of Plaintiffs' unexplained objection to Sandoz's construction and their recent consent in another case to a claim construction that contradicts their objection and validates Sandoz's construction, the Court should adopt Sandoz's construction of a "pharmaceutically active agent that is pH dependent" as "a molecule that provides activity in the body and that has pH-dependent aqueous solubility."

<strong>2.   "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5"</strong>

The parties' dispute regarding the construction of a "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5" (which appears in **all** asserted claims) is about the point of reference for the recited "increase" of the rate of release of the pharmaceutically active agent from the tablet." Plaintiffs contend that the claimed increased rate of release is measured relative to the rate of release in an environment that has a pH of 5.5 or below. (Shire Opening Br. at 25.) However, the patents and Plaintiffs' own argument belie this construction.

As explained in Sandoz's opening brief, the comparison intended by the claim language is **not** between drug release rates at a pH above 5.5 versus at a pH at or below pH 5.5. The proper comparison is between a composition with the recited "pH dependent agent" versus a composition without the pH dependent agent, which comparison is done at a pH in excess of 5.5. (Sandoz Opening Br. at 19-21.) The very object of the alleged invention is to provide a composition "having a pH independent or minimized pH dependent dissolution profile." ('599 & '794 patents 1:6-8, 28-30.) If the presence of the recited "pH dependent agent" caused faster drug release at a pH in excess of 5.5 than at pH 5.5 or below, as Plaintiffs propose, then a claimed composition including the required pH dependent agent would have a pH **dependent** dissolution profile and, therefore, it would not function for its intended purpose.

Plaintiffs' Illustrations 5 and 6 show this point.  (Shire Opening Br. at 28 & 30.)  Each of these illustrations shows a comparison of the dissolution of a control formulation that does not have the recited pH dependent agent (Formulation 22A) versus the dissolution of a formulation that does include the recited pH dependent agent (Formulation 32B, wherein the pH dependent agent is fumaric acid).  (*Id.*)  Both comparisons are done at a "pH in excess of 5.5," *i.e.*, at pH 6.8.  The illustrations show exactly what the disputed claim language states, *i.e.*, that when the recited pH dependent agent is added to the formulation, the "pH dependent agent . . . increases the rate of release of [the] pharmaceutically active agent from the tablet at a pH in excess of 5.5."

The patents themselves illustrate this principle in Table 2.  ('599 & '794 patents Table 2.) The first two formulations listed in the columns—Formulations 22A and 25B—are the control formulations.  (*See id.* Table 1 notes.)  Each of the remaining formulations includes at least one "pH dependent agent": 28B (sodium alginate), 32B (fumaric acid), 32D (copolymer of acrylic acid, *i.e.*, Carbopol 974P, and poly(methacrylic acid, ethyl acrylate), *i.e.*, Eudragit), and 39A (carrageenan).  (*See id.*)  Comparing column 2 (*i.e.*, data for a pH 6.8 dissolution medium) of either of the control formulations to column 2 of any of the experimental formulations that includes a "pH dependent agent" shows that the experimental formulations generally have a greater release of the pharmaceutically active agent (*i.e.*, a greater mean percent guanfacine dissolved at a given time).  (*Id.* Table 2.)  In the words of the patents, "[these] results show that the compositions of the present invention have improved dissolution profiles ***when compared with the control compositions*.**"  ('599 patent 5:36-38; '794 patent 7:1-3 (emphasis added).)

As explained in Sandoz's opening brief, under Plaintiffs' proposed construction, each of the experimental formulations listed in Table 2 would be ***excluded*** from the claim because Table 2 shows that the presence of the  "pH dependent agent" did not increase dissolution at a pH

above 5.5 as compared to a pH at or below 5.5 and, in fact, **decreased** dissolution of the pharmaceutically active agent, *i.e.*, the mean percent guanfacine dissolved for a given time is generally **lower** for column 2 (pH = 6.8 > 5.5) than for column 1 (pH = 1.2 < 5.5) for each of experimental formulations 28B, 32B, 32D, and 39A.   (*Id.* Table 2.)   Plaintiffs' construction cannot be correct if it excludes every embodiment of the alleged invention described in the patent specification.   *Vitronics*, 90 F.3d at 1583-84.

Finally, Plaintiffs' own proposed construction of this phrase in the Northern District of California Litigation includes the correct comparison—*i.e.*, a comparison between formulations with and without the pH dependent agent.   (Ex. 1 at 8.)   Plaintiffs' proposed construction in that case is a "[s]ubstance that, when the claimed composition is formulated, increases the rate of release of the active agent (i.e., drug) from the composition in an environment having a pH above 5.5 over when the composition is either (i) in an environment having a pH of 5.5 or less, or *(ii) when the composition is formulated without the pH dependent agent.*"   (*Id.* (emphasis added).)

Because Plaintiffs admit the comparison between a formulation with and without the pH dependent agent is valid, the Court should adopt Sandoz's construction of "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5" as "a substance that increases the rate of release of a pharmaceutically active agent from a composition in surrounding media having a pH above 5.5."

### 3. "polymer that swells at a pH in excess of 5.5"

The principal difference between the parties' constructions of a "polymer that swells at a pH in excess of 5.5" (which appears in claims 2, 9, and 28 of the '599 patent[1] and claims 4, 5, 9, and 10 of the '794 patent) is the same as that discussed above in Part II.B.2. Plaintiffs seek to add a claim requirement that swelling (or expansion) is greater at a pH above 5.5 as compared to pH 5.5 or below. Plaintiffs' only argument for this construction is that "Example 1 of these patents indicates that sodium alginate and carrageenan increase the release rate of the pharmaceutically active agent in an environment with a pH above 5.5. Therefore, the patents indicate that these polymers swell to a greater extent in a less acidic environment, as reflected in Plaintiffs' proposed construction." (Shire Opening Br. at 32 (footnote omitted).) Notwithstanding that the guanfacine dissolution data in Example 1, without more, do not prove Plaintiffs' presumed conclusion that sodium alginate and carrageenan in the experimental formulations must swell to a greater extent in a less acidic environment than in a more acidic environment, Plaintiffs' comparison to environments of different pH is misguided in view of the stated object of the alleged invention and the principle intended to be shown in Table 2.

More to the point here, however, is that the phrase "polymer that swells at a pH in excess of 5.5" has no words that require or suggest a comparison—like "increases" does in the phrase a "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5" discussed above in Part II.B.2. The plain meaning of the phrase is that a polymer that swells at a pH above 5.5 qualifies, regardless of whether it swells, shrivels, or remains static at a pH of 5.5 or below. What a polymer does at pH 5.5 or below is

---

[1] Plaintiffs have not asserted claims 2, 9, and 28 of the '599 patent asserted against Sandoz.

irrelevant to whether it meets the claim limitation of "swells at a pH in excess of 5.5." Adding the unsupported requirement Plaintiffs propose in their construction risks erroneously including or excluding a potential polymer based on its activity in an environment that is not discussed and was not intended.

Plaintiffs' own proposed construction of this phrase in the Northern District of California Litigation makes no comparison to pH at or below 5.5, as they urge here. In that case, Plaintiffs propose that the phrase should be construed to mean "[a] molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which, when the claimed composition is formulated, *expands at a pH above 5.5*." (Ex. 1 at 8 (emphasis added).)

Because there is no comparison to an environment of pH at or below 5.5 inherent in or suggested by the diction of the claim language or the specification, and because Plaintiffs agree with this in their own proposed construction of this phrase in related litigation, the Court should adopt Sandoz's construction of a "polymer that swells at a pH in excess of 5.5" as "a molecule with many units joined to each other through chemical covalent bonds, often in a repeating manner, which expands in surrounding media having a pH above 5.5."

### 4.    "agent that increases the solubility of at least one pharmaceutically active agent at a pH of greater than 5.5"

The parties' dispute regarding the construction of an "agent that increases the solubility of at least one pharmaceutically active agent at a pH of greater than 5.5" (which appears in claims 4, 11, 12, and 14 of the '599 patent) is the same as that discussed above in Parts II.B.2 & 3. Plaintiffs' proposed construction adds a requirement that a comparison is made between compositions at a pH above and below 5.5. That construction excludes every formulation of the invention described in the patent specification, and is contrary to the very purpose of the invention to provide pH-independent release.

14

Additionally, as with the phrase "pH dependent agent that increases the rate of release of said pharmaceutically active agent from the tablet at a pH in excess of 5.5" discussed above in Part II.B.2, Plaintiffs' own proposed construction of this phrase in the Northern District of California Litigation allows for the correct comparison—i.e., a comparison between formulations with and without the pH dependent agent.  (Ex. 1 at 9.)  Plaintiffs' proposed construction in that case is a "[s]ubstance that, when the claimed composition is formulated, increases the amount of the active agent (i.e., drug) that dissolves in another substance in an environment having a pH above 5.5 over when the composition is either (i) in an environment having a pH of 5.5 or less, or (ii) *when the composition is formulated without the agent that increases the amount of the active agent (i.e., drug) that dissolves in another substance.*"  (*Id.* (emphasis added).)

Because Plaintiffs admit the comparison between a formulation with and without the pH dependent agent is valid, the Court should adopt Sandoz's construction of "agent that increases the solubility of at least one pharmaceutically active agent at a pH of greater than 5.5" as "a substance that increases the amount of a pharmaceutically active agent that will dissolve when the surrounding media has a pH above 5.5."

### 5. "agent that maintains an acidic microenvironment in the composition"

Regarding the phrase an "agent that maintains an acidic microenvironment in the composition" (which appears in claim 13 of the '599 patent), before briefing, the parties disagreed about whether the recitation of "an acidic microenvironment" requires an inherent comparison to the macroenvironment of the surrounding media or composition.  Plaintiffs' proposed construction does not address this question and deliberately provides no context for construing the claim language.  But, Plaintiffs' discussion of this phrase in their opening brief makes the very point Sandoz addresses with its construction:

- "The usage of the term 'microenvironment' as it relates to pH (e.g., acidity) in the pharmaceutical arts at the time of the filing of the '599 and '794 patents concerned the pH of a small area *within a larger area or structure* . . . ." (Shire Opening Br. at 35 (emphasis added)); and

- "According to the plain language of the term and the patent disclosures, [an interplay between the acid and the active agent] occurs *in the composition that contains the active (e.g., in a tablet)*." (*id.* at 36 (emphasis added)).

Because the parties apparently agree that the definition of a "microenvironment" as the "regions immediately around or in close proximity to" necessarily relies on the contrast with the larger space the object occupies, and because this contrast must have been intended in the claim language by virtue of the claim's recitation of a "micro" environment rather than simply an "acidic []environment," the Court should adopt Sandoz's proposed construction of an "agent that maintains an acidic microenvironment in the composition" as "a substance that imparts a greater acidic character in the regions immediately around or in close proximity to a pharmaceutically active substance than that of the surrounding media."

   6.    "about"

   Shortly after the filing of its opening brief, Sandoz noticed a calculation error in the numeric ranges it proposed for construing the term "about" in connection with the specific weight percentage ranges recited in claims 18-23 of the '599 patent.  With the proposed numeric ranges, Sandoz intended to account for uncertainty based on the number of significant figures used in the numeric ranges recited by the claims.  (*See* Sandoz Opening Br. (Doc. No. 90) at 26-27.)  Sandoz intended to propose the same numeric ranges Plaintiffs agreed to in the Northern District of California Litigation.  (Ex. 1 at 13-15.)  The corrected ranges are shown below:

| Claim No. | Sandoz CORRECTED Proposed Construction and Construction agreed to by Plaintiffs in N.D. Cal. No. 10-cv-05467 |
|---|---|
| 18 | the pharmaceutically active agent is present in the composition in an amount of from 0.095 wt. % to 70.5 wt. % |
| 19 | the pharmaceutically active agent is present in the composition in an amount of from 0.95 wt. % to 40.5 wt. % |
| 20 | the non-pH dependent sustained agent is present in the composition in an amount of from 4.5 wt. % to 50.5 wt. % |
| 21 | the non-pH dependent sustained release agent is present in the composition in an amount of from 9.95 wt. % to 30.5 wt. % |
| 22 | at least one pH dependent agent is present in the composition in an amount of from 0.45 wt. % to 40.5 wt. % |
| 23 | at least one pH dependent agent is present in the composition in an amount of from 0.95 wt. % to 20.5 wt. % |

Sandoz promptly informed Plaintiffs of the error in Sandoz's opening brief and anticipated that the parties would be able to agree on Sandoz's corrected proposed construction in view of Plaintiffs' agreement to this construction in the Northern District of California Litigation. (*See* March 2, 2012 Letter from Vogel to Lief, attached hereto at Exhibit 2.) Plaintiffs did not confirm their consent to this corrected proposed construction by the time of filing this brief.

Sandoz maintains its assertion that "about" in claims 18-23 of the '599 patent should be construed to allow for rounding based on significant figures, as agreed to by Plaintiffs in the Northern District of California Litigation, and that the Court should reject Plaintiffs' proposed construction of "approximately."

**7.**     **"reducing the likelihood of side effects associated with the administration of guanfacine"**

The parties' major dispute regarding the phrase "reducing the likelihood of side effects associated with the administration of guanfacine" (which appears in claims 8-12 of the '794 patent) centers on the point of reference by which the claimed "reduction" is measured—*i.e.*, the claimed composition reduces the likelihood of side effects associated with the administration of guanfacine *as compared to what*?  Neither Plaintiffs' proposed construction, nor their discussion of this phrase in their opening brief, addresses this question or provides any context for construing the claim language.   (Shire Opening Br. at 36-38.)   However, as explained in Sandoz's opening brief, the specification is clear that the point of reference by which the claimed reduction is compared is *an immediate release composition*.   ('794 patent 11:61-67, 13:17 – 14:40, 13:61-65.)

Beyond this major point, the parties' constructions differ on whether "reducing the likelihood of side effects" refers to "reducing the probability of side effects" (Plaintiffs) or "decreasing the incidence or severity of side effects" (Sandoz).   Although the constructions appear to be incongruous, Plaintiffs' discussion of this phrase in their opening brief supports Sandoz's construction that a reduction in either *incidence* or *severity* of side effects is intended by the claim language.   Specifically, Plaintiffs note that the specification "provides for three possibilities regarding the reduction of side effects. Namely: (1) that there is a reduction in the *number of* [*i.e.*, incidence] side effects; (2) that there is a reduction in the [] likelihood of side effects; or (3) that the *severity* of the side effects is lessened."  (Shire Opening Br. at 37 (quoting ('794 patent 3:50-55).)  Plaintiffs' point is also supported by Example 5, which discusses both the incidence (*e.g.*, Tables 9 & 10) and severity (*e.g.*, 14:33-40) of adverse events.

Because the specification makes clear that the phrase "reducing the likelihood of side effects associated with the administration of guanfacine" is intended to refer to either incidence or severity of side effects and that the claimed reduction in side effects is relative to the side effects associated with the immediate release composition, the Court should adopt Sandoz's construction of this phrase as "decreasing the incidence or severity of side effects compared to administering the same amount of guanfacine as an immediate release composition."

## III.    CONCLUSION

Based on the reasons given herein, and the reasons presented to the Court in further briefing or during any claim construction hearing, Sandoz respectfully requests that the Court adopt Sandoz's proposed constructions of the disputed claim terms.

Dated:  March 16, 2012                          Respectfully submitted,

                                                *Original signature on file at Duane Morris LLP*

                                                s/  Richard T. Ruzich
                                                Edward C. Stewart
                                                Wheeler Trigg O'Donnell LLP
                                                1801 California Street, Suite 3600
                                                Denver, Colorado 80202
                                                Telephone:      303.244.1800
                                                Facsimile:      303.244.1879
                                                E-mail:         stewart@wtotrial.com

                                                and

                                                Richard T. Ruzich
                                                Duane Morris LLP
                                                190 South LaSalle Street, Suite 3700
                                                Chicago, Illinois 60603-3433
                                                Telephone:      312.499.6783
                                                Facsimile:      312.896.5652
                                                Email:          rtruzich@duanemorris.com

Laura A. Vogel
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA  02110
Telephone:      857-488-4284
Facsimile:      857-401-3045
Email:          lavogel@duanemorris.com

*Attorneys for Defendant Sandoz Inc.*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on March 16, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Thomas Clay Bell**
  tom.bell@dgslaw.com, bernadette.marquez@dgslaw.com
- **Richard Thomas Ruzich**
  rtruzich@duanemorris.com, paskinner@duanemorris.com, blkann@duanemorris.com

s/  Richard T. Ruzich

Richard T. Ruzich
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603-3433
Telephone:      312.499.6783
Facsimile:      312.896.5652
Email:          rtruzich@duanemorris.com

*Attorneys for Defendant Sandoz Inc.*